**[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 169.]**

HAMPEL, APPELLANT, *v*. FOOD INGREDIENTS SPECIALTIES, INC. ET AL.,

APPELLEES.

[Cite as *Hampel v. Food Ingredients Specialties, Inc.*, 2000-Ohio-128.]

*Civil rights—Unlawful discriminatory practices—Establishing violation of R.C. 4112.02(A)—Requirements to establish claim of hostile-environment sexual harassment—R.C. 4112.02(A) protects men as well as women from all forms of sex discrimination in the workplace—Harassing conduct that is simply abusive, with no sexual element, can support a claim for hostile-environment sexual harassment, when—Determining whether harassing conduct was "severe or pervasive" enough to affect conditions of plaintiff's employment.*

1.   A plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination "because of * * * sex" by proving either of two types of sexual harassment:  (1) "*quid pro quo*" harassment, *i.e.*, harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) "hostile environment" harassment, *i.e.*, harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment.

2.   In order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should

have known of the harassment and failed to take immediate and appropriate corrective action.

3. R.C. 4112.02(A) protects men as well as women from all forms of sex discrimination in the workplace, including discrimination consisting of same-sex sexual harassment.

4. Harassing conduct that is simply abusive, with no sexual element, can support a claim for hostile-environment sexual harassment if it is directed at the plaintiff because of his or her sex. However, harassment is not automatically discrimination because of sex merely because the words used have sexual content or connotations.

5. In order to determine whether the harassing conduct was "severe or pervasive" enough to affect the conditions of the plaintiff's employment, the trier of fact, or the reviewing court, must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment.

6. The social context in which particular behavior occurs and is experienced by its target is a relevant factor in judging the objective severity of harassment; however, sexual harassment that meets the statutory requirements is not excusable solely because it consists of conduct that is commonplace.

(No. 99-55 — Submitted November 30, 1999 — Decided June 21, 2000.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 73143.

_____

{¶ 1} This cause arises from a jury verdict in favor of plaintiff-appellant, Laszlo J. Hampel, on his claims for sexual harassment and intentional infliction of emotional distress against his former supervisor, defendant-appellee Jerry Hord,

and former employer, defendants-appellees Food Ingredients Specialties, Inc., Nestle Food Company, and Nestle USA, Inc. (collectively, "FIS-Nestle").

{¶ 2} On April 17, 1995, Hampel was working as a cook for FIS-Nestle. His job involved cooking thousands of pounds of meat at a time, using electronically controlled steam injected kettles to produce a blended product. Work was particularly stressful that night, and Hampel became frustrated over not having enough bins for the finished food product, which was an ongoing problem. He went to Hord to complain about the situation, and the following dialogue took place in the presence of Hampel's coworkers:

Hampel: "I'm fed up with the way things are running around here, all this product, and no bins to put it in. One of these days I'm going to blow."

Hord: "Hey, Laz, you can blow me."

Hampel: "What did you say?"

Hord: "I said, you can suck my dick."

Hampel: "I'm frustrated because there are no bins and you tell me to suck your dick? I don't want to think my supervisor is a faggot."

Hord: "But Laz, I only want you to suck my dick. You're the only man in the world that I want to suck my dick. Danny and Ed don't do anything for me."

Hampel: "Man, you're sick."

Coworker: "That is really sick, Jerry."

Hord: "But, Laz, I want you to taste my cum and go, umm, umm, umm, and I want you to wear my pearl necklace."

Hampel: "Man, you're really sick. I'm out of here."

{¶ 3} At the end of his shift, Hampel went to Hord's office and told Hord that his remarks were degrading, humiliating, and offensive. Hord responded that "if you don't like it, quit."

{¶ 4} Hampel came to work early on April 18, 1995, and lodged a grievance with Ingoff Nitsch, vice-president of manufacturing. Nitsch took Hampel to see

Lori Foss, manager of employee services, and Daniel Mullen, manager of process control, and the three of them questioned Hampel about the incident. Hampel got the impression that "[t]hey were trying to make me feel like I was the one who did something wrong, like I was a criminal being interrogated. * * * It was almost as if they were upset with me for doing this to Jerry." Later that day, Hord apologized to Hampel, but Hampel, believing the apology to be insincere, said nothing and Hord walked away. The following day, April 19, 1995, Hampel put his grievance in writing, and the day after that Hord filed a report warning Hampel for doing a poor job of cleaning.

{¶ 5} Foss and Mullen investigated the incident, concluded that it happened as reported by Hampel, and gave Hord a written warning, which is at the lower end of possible corrective action. Mullen then informed Hampel that Hord would be reprimanded, but did not reveal the nature of the reprimand. However, Hampel told Mullen that he could no longer work for Hord and asked if he or Hord could be moved. Mullen responded in the negative and Hord continued as Hampel's supervisor. A short time later, however, Hord rotated to another area and, until January 1996, his shift overlapped Hampel's for only an hour on Mondays.

{¶ 6} Nevertheless, between April 1995 and January 1996, Hord continued to harass Hampel. He constantly watched Hampel, criticized him for minute or minor details, reported him for cleaning errors, and denied him shortcuts in his work that Hord allowed to other employees and previously to Hampel. On slow nights, when other employees would request to leave work early, Hord would grant the request without inspecting their work. However, whenever Hampel made such a request, Hord would "tur[n] everything inside out, looking for anything he could find, and he usually always did. And on many occasions he would make me clean and clean and reclean again." On one occasion, Hord took a white cotton glove to inspect Hampel's cleaning and went around showing the grease on the glove. On another occasion, Hord ran up to Hampel, stood six inches from Hampel's face,

and shouted, "you get out of my department right now. I don't ever want to see you again."

{¶ 7} During this time, Hord received two merit pay increases, while Hampel applied for and was refused several position changes that would have transferred him away from Hord or placed him in a position where Hord would not be his supervisor.

{¶ 8} In January 1996, Hord was reassigned as Hampel's full-time supervisor. One day early that month, Hord asked Hampel if he would be interested in taking a job as cook on the day shift. Although Hampel did not like to work days, he expressed interest in the job because it would allow him to get away from Hord. However, a coworker, Michael Conrad, told Hampel that he heard Hord make a comment about following Hampel to the day shift. Hampel was enraged and his coworkers began to tease him about Hord following him to the day shift. Hord was aware of this, but did nothing to stop the torment or assure Hampel that he had no such intent.

{¶ 9} On January 5, 1996, Hampel told Mullen and Nitsch that he was concerned about Hord following him to the day shift, and Mullen investigated. Mullen concluded that the incident was the result of a prank perpetrated entirely by some of Hampel's coworkers without any influence or participation from Hord. Nevertheless, he and Foss told Hord to file an incident report against Hampel, which Hord did but later withdrew. Mullen then typed a report of his investigation, after destroying his original handwritten notes, which was placed in Hampel's personnel file. The report states: "We are going to recognize Jerry's counter charges. * * * If [Conrad's] testimony does not contradict the others, Lori and I will have to talk to Laszlo about the counter charges and warn him that any false statements in the future could mean up to and including termination." The report also indicates that some employees "told me about Laszlo going out with an eighteen or nineteen year old girl and every night he parades around showing his

neck full of 'sucker bites,' " and concludes that "[i]t looks to me like Laszlo likes to 'give it' but can't take it."

{¶ 10} As a result of these events, Hampel became depressed, homicidal, drained, and exhausted. He had recurring nightmares about Hord holding a gun to his head and demanding oral sex. He felt victimized, violated, and "totally raped." He experienced stomach cramps, shortness of breath, and sleeping problems. He was diagnosed as suffering from depression, post-traumatic stress disorder, and severe emotional distress. Hampel took a medical leave of absence on March 7, 1996, and resigned from work on May 15, 1996.

{¶ 11} Hampel filed suit in the Cuyahoga County Court of Common Pleas, claiming that appellees violated R.C. Chapter 4112 by subjecting him to a sexually hostile work environment and retaliating against him for complaining about sexual harassment, and that they intentionally caused him severe emotional distress. The case proceeded to trial by jury and, after denying appellees' motions for directed verdict, the trial court submitted all three claims to the jury.

{¶ 12} The jury returned with verdicts and answers to ten interrogatories. The verdict forms indicate that the jury awarded compensatory damages to Hampel in the amount of $368,750 on his claims for sexual harassment and intentional infliction of extreme emotional distress against Hord and FIS-Nestle, and assessed punitive damages against FIS-Nestle in the amount of $1,280,000. The answers to interrogatories reveal that the jury found for Hampel on the issues of sexual harassment, intentional infliction of emotional distress, and malice, and against Hampel on the issue of retaliatory conduct.[1]

---

1. The jury's answers to the interrogatories submitted are as follows:
    Interrogatory No. 1: "Was Plaintiff subjected to unwelcome sexual harassment during his employment at FIS?" Answer: Yes.
    Interrogatory No. 2: "Was Mr. Hord's April 17, 1995 conduct based upon sex?" Answer: Yes.

{¶ 13} The trial court denied appellees' post-trial motions for judgment notwithstanding the verdict ("JNOV") and for a new trial, and entered judgment upon the verdict.

{¶ 14} The court of appeals reversed the judgment of the trial court on Hampel's claim for sexual harassment, finding no evidence to support the conclusion that Hord's conduct was based on sex, and remanded the cause for a new trial on Hampel's claim for intentional infliction of emotional distress. Although the court found the evidence sufficient to support an award of compensatory and punitive damages for intentional infliction of emotional distress, and found no error with respect to the trial or submission of that claim, it remanded the cause for a new trial on that issue because it was unable to ascertain from the record whether, and to what extent, the jury would have awarded damages solely for the intentional infliction of emotional distress claim.

{¶ 15} Subsequently, Hampel filed a motion for reconsideration pursuant to App.R. 26(A), arguing that the judgment should be affirmed pursuant to the application of the "two issue" rule. The court of appeals denied the motion, finding that the two-issue rule does not apply where there is a charge on an issue upon

---

Interrogatory No. 3: "Would the complained of conduct unreasonably interfere with the work performance of a reasonable person or create an intimidating, hostile or offensive work environment for that reasonable person?" Answer: Yes.

Interrogatory No. 4: "Did FIS take measures that were both timely and reasonable and were such measures appropriate as to punishment of Hord?" Answer: No. "And were such measures appropriate to prevent a reoccurrence?" Answer: No.

Interrogatory No. 5: "Did FIS engage in retaliatory conduct against Plaintiff?" Answer: No.

Interrogatory No. 6: "Did FIS make Plaintiff's working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign?" Answer: Yes.

Interrogatory No. 7: "Did Defendants intentionally or recklessly act in an extreme and outrageous manner?" Answer: Yes.

Interrogatory No. 8: "Would a reasonable person, normally constituted, be able to cope adequately with the mental distress caused by Defendant's conduct?" Answer: No.

Interrogatory No. 9: "Was the Defendants' conduct a proximate cause of Plaintiff's mental anguish?" Answer: Yes.

Interrogatory No. 10: "Did Defendants act with malice toward Plaintiff?" Answer: Yes.

which there should have been no charge. "Because one claim was submitted to the jury in error, and the damages awarded on each claim cannot be differentiated, a new trial on the other claim should be ordered."

{¶ 16} The cause is now before this court pursuant to the allowance of a discretionary appeal.

————————————

*The Simon Law Firm, P.L.L., Ellen S. Simon* and *Christopher P. Thorman*, for appellant.

*Arter & Hadden* and *Irene C. Keyse-Walker;* and *Mary Lee Pilla*, for appellees.

————————————

**ALICE ROBIE RESNICK, J.**

{¶ 17} We are asked to determine whether the evidence presented in this case is sufficient to withstand a motion for directed verdict or JNOV on appellant's claim for sexual harassment and, if not, whether the submission of that claim to the jury was sufficiently prejudicial to warrant a new trial on appellant's claim for intentional infliction of emotional distress.

I

SEXUAL HARASSMENT

{¶ 18} As relevant here, R.C. 4112.02(A) makes it an unlawful discriminatory practice "[f]or any employer, because of the * * * sex * * * of any person, * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 19} In prior cases, "we have determined that federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112."

*Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*
(1981), 66 Ohio St.2d 192, 196, 20 O.O.3d 200, 202, 421 N.E.2d 128, 131.

A

Hostile-Environment Sexual Harassment

{¶ 20} In *Meritor Sav. Bank, FSB v. Vinson* (1986), 477 U.S. 57, 64-66, 106 S.Ct. 2399, 2404-2405, 91 L.Ed.2d 49, 58-59, the United States Supreme Court rejected the view that Title VII is unconcerned with purely psychological aspects of the workplace environment and, therefore, prohibits sexual harassment only when it is directly linked to the grant or denial of an economic benefit. Recognizing that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent ' "to strike at the entire spectrum of disparate treatment of men and women" ' in employment," *id.* at 64, 106 S.Ct. at 2404, 91 L.Ed.2d at 58, the high court explained that a man or woman should not have to " 'run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living.' " *Id.*, 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 59, quoting *Henson v. Dundee* (C.A.11, 1982), 682 F.2d 897, 902.

{¶ 21} Accordingly, the court held that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.* at 66, 106 S.Ct. at 2405, 91 L.Ed.2d at 59. To do so, the plaintiff must show that the harassing conduct was "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Id.* at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60, quoting *Henson, supra,* 682 F.2d at 904.

{¶ 22} In *Harris v. Forklift Sys., Inc.* (1993), 510 U.S. 17, 21-22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 302, the court further explained:

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the

victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."

{¶ 23} However, the conduct need not be psychologically injurious to be actionable. "A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality." *Id.*, 510 U.S. at 22, 114 S.Ct. at 370-371, 126 L.Ed.2d at 302.

{¶ 24} Accordingly, we hold that a plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination "because of * * * sex" by proving either of two types of sexual harassment: (1) "*quid pro quo*" harassment, *i.e.*, harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) "hostile environment" harassment, *i.e.*, harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment.

{¶ 25} In order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer,

through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.[2]

B

Same-Sex Harassment

{¶ 26} The parties agree, and the court of appeals accepted, that R.C. 4112.02(A) should be interpreted to accord with the United States Supreme Court's decision in *Oncale v. Sundowner Offshore Serv., Inc.* (1998), 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201. In *Oncale*, the high court held that sex discrimination consisting of same-sex sexual harassment, whether *quid pro quo* or hostile environment, is actionable under Title VII. In so holding, the court explained:

"Title VII's prohibition of discrimination 'because of * * * sex' protects men as well as women, *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, [103 S.Ct. 2622, 2630, 77 L.Ed.2d 89, 101] (1983), and in the related context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race. 'Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not

---

2. Most courts also require the plaintiff to show that he or she belongs to a protected class, but we find this requirement unnecessary; there are only two sexes and both of them are entitled to protection under R.C. 4112.02(A). See, generally, 3 Larson, Employment Discrimination (2 Ed.2000) 46-121, Section 46.08[1][b]. As to the first requirement, that the alleged harassment was unwelcome, see *Vinson, supra*, 477 U.S. at 68, 106 S.Ct. at 2406, 91 L.Ed.2d at 60 ("The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome' "). As to the second and third requirements, they are statutorily mandated. Both the parties and the court of appeals are in general agreement as to these requirements as set forth in *Delaney v. Skyline Lodge, Inc.* (1994), 95 Ohio App.3d 264, 270, 642 N.E.2d 395, 399-400. However, the last requirement listed in *Delaney* is "the existence of *respondeat superior* liability." *Id.* at 270, 642 N.E.2d at 400. Although this description is not necessarily erroneous, the United States Supreme Court has since established vicarious employer liability for unlawful harassment by supervisors, and the federal courts uniformly apply a "known or should have known" test in determining an employer's liability for harassment by nonsupervisory coworkers or nonemployees. See *Faragher v. Boca Raton* (1998), 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662; *Burlington Industries, Inc. v. Ellerth* (1998), 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633; *Shepherd, infra*, 168 F.3d at 1004; 3 Larson, *supra*, at 46-88 to 46-106, Sections 46.07[1] through [4].

discriminate against other members of that group.' *Castaneda v. Partida*, 430 U.S. 482, 499, [97 S.Ct. 1272, 1282, 51 L.Ed.2d 498, 513] (1977). * * * If our precedents leave any doubt on the question, we hold today that nothing in Title VII necessarily bars a claim of discrimination 'because of * * * sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex.

" * * *

"We see no justification in the statutory language or our precedents for a categorical rule excluding same-sex harassment claims from the coverage of Title VII. As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits 'discriminat[ion] * * * because of * * * sex' in the 'terms' or 'conditions' of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements." *Id.*, 523 U.S. at 78-80, 118 S.Ct. at 1001-1002, 140 L.Ed.2d at 206-207.

**{¶ 27}** We too find the high court's interpretation of Title VII in *Oncale* to be both persuasive and applicable in interpreting R.C. 4112.02(A). Accordingly, we hold that R.C. 4112.02(A) protects men as well as women from all forms of sex discrimination in the workplace, including discrimination consisting of same-sex sexual harassment.

C

Harassment on the Basis of Sex

**{¶ 28}** The court of appeals correctly observed that, since no tangible employment action was taken in this case, appellant's claim is based on the creation of a hostile working environment. The court of appeals concluded, however, that

12

appellant's evidence was insufficient to satisfy the based-on-sex requirement. In particular, the court found no evidence that Hord's April 17, 1995 comments were made to Hampel "*because of* his gender" (emphasis *sic*), and "no evidence of a sexual motivation for Hord's alleged harassment of [Hampel] after the April 17, 1995 incident."

{¶ 29} Harassment "because of * * * sex" is the *sine qua non* for any sexual harassment case. "But harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale, supra*, 523 U.S. at 80, 118 S.Ct. at 1002, 140 L.Ed.2d at 208. As Professor Larson points out, the term "sexual," as used to modify harassment, "can refer both to sex as the immutable gender characteristic and to sex as describing a range of behaviors associated with libidinal gratification." 3 Larson, Employment Discrimination (2 Ed.2000) 46-34, Section 46.03[4]. Thus, actions that are simply abusive, with no sexual element, can support a claim for sexual harassment if they are directed at an employee because of his or her sex. Simply put, "[h]arassment alleged to be because of sex need not be explicitly sexual in nature." *Carter v. Chrysler Corp.* (C.A.8, 1999), 173 F.3d 693, 701.

{¶ 30} As explained in the oft-cited opinion in *McKinney v. Dole* (C.A.D.C.1985), 765 F.2d 1129, 1138-1139:

"We have never held that sexual harassment or other unequal treatment of an employee or group of employees that occurs because of the sex of the employee must, to be illegal under Title VII, take the form of sexual advances or of other incidents with clearly sexual overtones. And we decline to do so now. Rather, we hold that any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII.

" * * *

"Thus a continuing pattern of behavior that differentiates a particular employee or group of employees because of sex violates the equal 'conditions of employment' requirement of Title VII. Clearly, then, if a supervisor consistently uses physical force toward an employee because of that employee's sex, the use of such force may, if pervasive enough, form an illegal 'condition of employment.' So too a pattern of mixed sexual advances and physical force may be illegally discriminatory if based on the employee's sex. Consistently disparate treatment, however, need not take the form of actual physical assault and/or battery in the classic sense. A pattern of threatened force or verbal abuse, if based on the employee's sex, may be illegally discriminatory. In fact, any disparate treatment, even if not facially objectionable, may violate Title VII."

{¶ 31} There are many, often overlapping, motivations for sexual harassment in the workplace, any one of which can be manifested in conduct as varied and multiform as human behavior itself. Not surprisingly, abusive sex-based conduct is frequently nonsexual or facially neutral in content or appearance. Any presumption that discriminatory conduct based on sex will necessarily announce itself as such would not only be unwise, but would create a means to circumvent the very statutory prohibition against it. The wisdom of rejecting a rule that excludes consideration of so-called nonsexual instances of harassment is reflected not only in the fact that courts generally refuse it, but also in the broad range of behaviors that comprise the sexual harassment claims in those cases. *Williams v. Gen. Motors Corp.* (C.A.6, 1999), 187 F.3d 553; *O'Shea v. Yellow Technology Serv., Inc.* (C.A.10, 1999), 185 F.3d 1093; *Smith v. St. Louis Univ.* (C.A.8, 1997), 109 F.3d 1261; *Kimzey v. Wal-Mart Stores, Inc.* (C.A.8, 1997), 107 F.3d 568; *Gillming v. Simmons Industries* (C.A.8, 1996), 91 F.3d 1168, 1171; *Kopp v. Samaritan Health Sys., Inc.* (C.A.8, 1993), 13 F.3d 264, 269; *Cortes v. Maxus Exploration Co.* (C.A.5, 1992), 977 F.2d 195, 198-199; *Robinson v. Jacksonville Shipyards, Inc.* (M.D.Fla.1991), 760 F.Supp. 1486, 1522-1523; *Andrews v.*

*Philadelphia* (C.A.3, 1990), 895 F.2d 1469, 1485; *Hall v. Gus Constr. Co., Inc.* (C.A.8, 1988), 842 F.2d 1010, 1013-1014; *Hicks v. Gates Rubber Co.* (C.A.10, 1987), 833 F.2d 1406, 1415; *Bell v. Crackin Good Bakers, Inc.* (C.A.11, 1985), 777 F.2d 1497.

{¶ 32} On the other hand, "workplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale, supra*, 523 U.S. at 80, 118 S.Ct. at 1002, 140 L.Ed.2d at 207. Oftentimes, the use of certain vulgar expressions "has no connection with the sexual acts to which they make reference * * * [and] they are simply expressions of [personal] animosity or juvenile provocation," rather than discrimination based on sex. Thus, "[a]lthough explicit sexual content or vulgarity may often take a factfinder a long way toward concluding that harassing comments were in fact based on gender, * * * this need not necessarily be the case." *Johnson v. Hondo, Inc.* (C.A.7, 1997), 125 F.3d 408, 412. Cf. *Shepherd v. Slater Steels Corp.* (C.A.7, 1999), 168 F.3d 998, 1010-1011.

{¶ 33} Accordingly, we hold that harassing conduct that is simply abusive, with no sexual element, can support a claim for hostile-environment sexual harassment if it is directed at the plaintiff because of his or her sex. However, harassment is not automatically discrimination because of sex merely because the words used have sexual content or connotations.

D

"Severe or Pervasive"

{¶ 34} Appellees argue that "Hord's isolated verbal outburst was not, as a matter of law, sufficiently severe or pervasive as to alter the conditions of employment in a significant way."

{¶ 35} But "the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation." *Penry v. Fed. Home Loan Bank of Topeka* (C.A.10, 1998), 155 F.3d 1257, 1262. Instead, the issue of

"whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris, supra*, 510 U.S. at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale, supra*, 523 U.S. at 81-82, 118 S.Ct. at 1003, 140 L.Ed.2d at 208.

{¶ 36} The totality-of-the-circumstances standard precludes the kind of analysis that carves the work environment into distinct harassing incidents to be judged each on its own merits. Instead, it is essential that the work environment be viewed as a whole, "keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes." *Robinson, supra*, 760 F.Supp. at 1524. Thus, "even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Williams, supra*, 187 F.3d at 563.

{¶ 37} As one court so aptly put it, "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews, supra*, 895 F.2d at 1484.

{¶ 38} Along these same lines, it is generally understood that the "severe or pervasive" requirement does not present two mutually exclusive evidentiary choices, but reflects a unitary concept where deficiencies in the strength of one factor may be made up by the strength in the other. See, *e.g., Ellison v. Brady*

(C.A.9, 1991), 924 F.2d 872, 878 ("the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct"); *Robinson, supra*, 760 F.Supp. at 1524 ("greater severity in the impact of harassing behavior requires a lesser degree of pervasiveness in order to reach a level at which Title VII liability attaches"). See, also, *Lockard v. Pizza Hut, Inc.* (C.A.10, 1998), 162 F.3d 1062. And since harassing conduct alleged to be because of sex need not be explicitly sexual in nature, it follows that "[a] plaintiff may also be able to testify to episodes of non-sexual abusive treatment, as well as to sexual conduct, in order to establish the necessary pervasiveness." 3 Larson, *supra*, at 46-74, Section 46.05[4][b].

{¶ 39} Accordingly, we hold that in order to determine whether the harassing conduct was "severe or pervasive" enough to affect the conditions of the plaintiff's employment, the trier of fact, or the reviewing court, must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment.

E

Commonplace Harassment

{¶ 40} There is a current running through the court of appeals' opinion and appellees' brief suggesting that sexually abusive workplace behavior is somehow excusable merely because it is commonplace. We emphatically reject the notion and hold that, while the social context in which particular behavior occurs and is experienced by its target is a relevant factor in judging the objective severity of harassment, sexual harassment that meets the statutory requirements is not excusable solely because it consists of conduct that is commonplace.

{¶ 41} In *Oncale, supra*, 523 U.S. at 81, 118 S.Ct. at 1003, 140 L.Ed.2d at 208, the high court explained:

"In same-sex (as in all) harassment cases, [the objective severity] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office."

{¶ 42} However, the coach's described behavior toward his secretary would not become any less abusive merely because he or other coaches generally engage in such behavior. Otherwise, the sexually harassed plaintiff would be placed in the anomalous position of defeating his or her own claim by virtue of proving the very pervasiveness required to establish the claim in the first place. Indeed, it is difficult to imagine that such conduct as described in *Oncale* would be acceptable anywhere but on the playing field. In fact, the very same behavior, occurring elsewhere, has been held "patently abusive and offensive—even though it happened infrequently and for a short period." *Campbell v. Kansas State Univ.* (D.Kan.1991), 780 F.Supp. 755, 762.

{¶ 43} The high court never accepted that aspect of the social-context argument that uses the pervasiveness of discriminatory behavior as a means to diminish its impact. R.C. 4112.02(A), like Title VII, would never have been enacted if the discriminatory conduct it prohibits were not at least pervasive enough in our society to constitute a public social problem. "In enacting R.C. Chapter 4112 * * *, the General Assembly undoubtedly was responding to a public social problem. Discrimination in its various forms drains our economic resources, subverts the democratic process and undermines the general welfare. It is inconceivable that the General Assembly, in passing this legislation, was unconcerned with deterring such socially inimical business practices." *Cosgrove v. Williamsburg of Cincinnati Mgt. Co., Inc.* (1994), 70 Ohio St.3d 281, 288, 638

N.E.2d 991, 996 (Resnick, J., concurring). As one court observed: " 'If the pervasiveness of an abuse makes it nonactionable, no inequality sufficiently institutionalized to merit a law against it would be actionable.' " *Robinson, supra,* 760 F.Supp. at 1526, quoting MacKinnon, Feminism Unmodified (1987) 115.

**{¶ 44}** Addressing this issue in *Williams, supra*, 187 F.3d at 564, the Sixth Circuit Court of Appeals explained:

"Of course, the fact that a district court should look at the totality of circumstances and the context of the alleged harassment does not mean that courts can point to long-standing or traditional hostility toward women to excuse hostile-work-environment harassment. At oral argument, [plaintiff's] attorney asked the court whether the conduct alleged in this case would be tolerated in our courthouses. We believe it would not, and we reject the view that the standard for sexual harassment varies depending on the work environment. * * *

" * * *

"We do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment; indeed, we find this reasoning to be illogical, because it means that the more hostile the environment, and the more prevalent the sexism, the more difficult it is for a Title VII plaintiff to prove that sex-based conduct is sufficiently severe or pervasive to constitute a hostile work environment. Surely women working in the trades do not deserve less protection from the law than women working in a courthouse."

**{¶ 45}** Any holding to the contrary would amount to a judicial grandfather clause preserving the very discriminatory practices proscribed by the statute.

F

Sufficiency of the Evidence

**{¶ 46}** We have no hesitation in finding that Hampel presented sufficient evidence from which reasonable minds could conclude, when considering the totality of all the facts and surrounding circumstances, that the harassing conduct

in this case was sufficiently severe or pervasive to affect the conditions of Hampel's employment. Construing the evidence most strongly in Hampel's favor, Civ.R. 50(A)(4), it is apparent that, beginning with the April 17, 1995 incident, which by all accounts was severe and shocking in the extreme, and continuing through January 1996, Hord created a hostile and abusive working environment for Hampel. Considering the evidence of Hord's constant and unrelenting abusive conduct toward Hampel, the fact that Hampel's requests for transfer away from Hord were denied while Hord received pay raises, and the disparaging information that Mullen placed in Hampel's file, the jury could reasonably conclude that Hampel was subjected to a hostile and intimidating working environment.

{¶ 47} The more difficult question in this case is whether reasonable minds could conclude that the hostility directed at Hampel was based on sex. The April 17, 1995 episode is the only evidence upon which Hampel relies to raise an inference of discrimination because of sex. Hord's language that day was indisputably graphic and sexual in content, but the question is whether this language provides a sufficient evidentiary basis to support an inference of sex discrimination in this case.

{¶ 48} Hampel argues that "the words used were so extreme and so 'admittedly severe' and graphic that they alone would support an inference that Hord was soliciting sex." According to Hampel, he should not have to prove that "the individual who chose [such] language was actually motivated by sexual desire or was in fact a homosexual. No similar burden attaches to a victim of opposite sex harassment."

{¶ 49} In *Oncale*, the high court rejected the proposition that "workplace harassment that is sexual in content is always actionable, regardless of the harasser's sex, sexual orientation, or motivations." *Id.*, 523 U.S. at 79, 118 S.Ct. at 1002, 140 L.Ed.2d at 207. The court explained that the inference of sexual desire made in opposite-sex harassment situations involving "explicit or implicit

proposals of sexual activity * * * would [also] be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual." *Id.* at 80, 118 S.Ct. at 1002, 140 L.Ed.2d at 208.

{¶ 50} However, no such credible evidence appears in this record. While the harasser's words and conduct themselves may sometimes suffice to raise the inference of homosexuality or sexual desire circumstantially, the record in this case points unequivocally to the fact that the expressive function of Hord's language was to mimic rather than reveal any actual sexual desire for Hampel.

{¶ 51} Hampel further argues that because Hord testified that what he said to Hampel "I wouldn't say * * * to a woman," Hord's conduct can be construed to reflect gender animus. In addition, Hampel argues, there is record evidence that Hord preferred to work with women and conferred more favorable benefits on female employees, which either bolsters the inference of gender animus or constitutes direct comparative evidence of disparate treatment.

{¶ 52} In the context of Hord's testimony, however, his admission that he would not have used the same language toward a woman reflects some personal morality code, rather than an aversion to men in the workplace, and the record fails to disclose any disparity in the way Hord treated male and female employees.

{¶ 53} Thus, we agree with the court of appeals that "[t]he evidence in this case points solely to the conclusion that Hord's outburst against [Hampel] was personal and not gender-based." The same is true of all of Hord's conduct. Hord undoubtedly inflicted serious abuse upon Hampel, not because of his sex, but because he was Hampel. However, R.C. 4112.02(A) does not reach disparate treatment on account of personal animosity; no matter how severe or pervasive the conduct, harassment does not constitute a discriminatory practice under R.C. 4112.02(A) unless based on a prohibited classification.

**{¶ 54}** Accordingly, appellees' motion for a directed verdict or JNOV should have been granted on appellant's sexual harassment claim, and the judgment of the court of appeals is affirmed as to this issue.

II

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**{¶ 55}** Having held that the sexual harassment claim should not have been submitted to the jury, the question becomes whether it is necessary, in the interest of substantial justice, to reverse the judgment of the trial court and remand the cause for a new trial on appellant's claim for intentional infliction of emotional distress.

**{¶ 56}** "It is an elementary proposition of law that an appellant, in order to secure reversal of a judgment against him, must not only show some error but must also show that that error was prejudicial to him." *Smith v. Flesher* (1967), 12 Ohio St.2d 107, 110, 41 O.O.2d 412, 414, 233 N.E.2d 137, 140. "[T]he so-called two-issue rule necessarily results from this elementary proposition of law." *Id.* at 110-111, 41 O.O.2d at 414, 233 N.E.2d at 140.

**{¶ 57}** The two-issue rule, which derives from this court's holding in *Sites v. Haverstick* (1873), 23 Ohio St. 626, has been defined variously depending upon the context of its application. The definition chosen by both the parties and the court of appeals in this case is that set forth in *H.E. Culbertson Co. v. Warden* (1931), 123 Ohio St. 297, 303, 175 N.E. 205, 207:

"This rule as generally applied is that, where there are two causes of action, or two defenses, thereby raising separate and distinct issues, and a general verdict has been returned, and the mental processes of the jury have not been tested by special interrogatories to indicate which of the issues was resolved in favor of the successful party, it will be presumed that all issues were so determined; and that, where a single determinative issue has been tried free from error, error in presenting another issue will be disregarded."

**{¶ 58}** This case potentially implicates the so-called two-issue rule because even though the jury returned interrogatories indicating which issues were resolved in favor of appellant, the court of appeals determined that it remained unclear upon which of those issues the damage awards were based, particularly the award for punitive damages.

**{¶ 59}** However, the two-issue rule "does not apply where there is a charge on an issue upon which there should have been no charge." *Ricks v. Jackson* (1959), 169 Ohio St. 254, 8 O.O.2d 255, 159 N.E.2d 225, paragraph four of the syllabus. In that event, "prejudice is generally presumed." *Wagner v. Roche Laboratories* (1999), 85 Ohio St.3d 457, 461, 709 N.E.2d 162, 165.

**{¶ 60}** In *Wagner*, we determined that the giving of an instruction that should not have been given is not always sufficiently prejudicial to justify a reversal of the judgment. "Even if we assume for the purposes of argument that the instruction should not have been given, we find that the record does not require overturning the trial court's decision to deny a new trial. Our specific disagreement with the court of appeals' approach is with the degree of prejudice that the court of appeals apparently attributed to the giving of the instruction." *Id.*, 85 Ohio St.3d at 461, 709 N.E.2d at 165.

**{¶ 61}** The dissent in *Wagner* disagreed with our "degree of prejudice" approach, finding instead that "[t]he quantum of prejudice * * * is not the barometer for application of the *Ricks* analysis." *Id.*, 85 Ohio St.3d at 463, 709 N.E.2d at 167 (Cook, J., dissenting). However, just the opposite is true: "The opinion in [*Ricks*] recognizes that the erroneous giving of a special request to charge may not be sufficiently prejudicial to justify a reversal." *Smith, supra*, 12 Ohio St.2d at 114, 41 O.O.2d at 416, 233 N.E.2d at 142.

**{¶ 62}** Despite the approach taken by the dissent in *Wagner*, and the court of appeals in this case, *Ricks* does not purport to set forth a rule of mandatory or automatic reversal whenever there is a charge on an issue upon which there should

have been no charge. To the contrary, *Ricks* provides that there may be instances where such a charge can be regarded as not prejudicial. *Id.*, 169 Ohio St. at 257, 8 O.O.2d at 257, 159 N.E.2d at 227. Otherwise, a reviewing court could order a new trial upon a presumptive finding of prejudice where the record actually establishes the contrary.

{¶ 63} Upon a thorough review of the entire transcript of proceedings before the trial court, it is our determination that the jury, if not instructed on sexual harassment, would still have decided in appellant's favor on his claim for intentional infliction of emotional distress. The jury was instructed that although it is possible that evidence supporting sexual harassment could also support a claim for intentional infliction of emotional distress, "the two causes of action are different; and your decision as to whether a claim under one theory is valid or invalid would not necessarily control your decision as to the validity or invalidity of the other cause of action." The court further instructed that a claim for sexual harassment "is limited to the workplace; it is dependent upon conduct based on sex," whereas a claim for intentional infliction of emotional distress "is not linked to the workplace; it is not limited to conduct based on sex." As appellees themselves have noted, "[t]he elements of a sexual harassment claim and an intentional infliction of emotional distress claim are substantively different and conclusions relating to the liability of one do not transfer to another."

{¶ 64} In addition, the evidence presented with regard to both claims was identical. All relevant evidence that was presented in support of sexual harassment was also relevant and admissible with regard to intentional infliction of emotional distress. The jury was simply asked to make a determination with respect to separate theories of recovery based on a single set of operative facts. Upon this record, we cannot presume that appellees were prejudiced by the trial court's instruction on sexual harassment. Thus, *Ricks* is not applicable.

**{¶ 65}** Appellees argue, however, that "the interrogatories and verdict forms reflect the jury's focus on sexual harassment. In their original interrogatory answers, the jury found facts which would support a claim for sexual harassment *only*. The rejected verdict form that awarded compensatory damages against Hord alone, states that the jury found for Hampel only on the claim of sexual harassment-hostile work environment." (Emphasis *sic*.) It appears that the trial court rejected the jury's initial answers to the interrogatories as inconsistent and that, in its answers to the rejected interrogatories, the jury had checked both "yes" and "no" on interrogatory No. 8, see fn. 1, but scratched out the word "no" and the check next to it.

**{¶ 66}** This argument was the substance of an assignment of error raised below that the court of appeals overruled. Having failed to file a cross-appeal on that issue, appellees are precluded from raising the argument here. Moreover, when appellees raised this issue with the trial court, the trial court confirmed with the jury, who had not yet been dismissed, that its intent was in fact to answer "no" to interrogatory No. 8. We cannot conclude, therefore, that the jury at any time intended to find against Hampel on his claim for intentional infliction of emotional distress.

**{¶ 67}** Since *Ricks* does not apply, resort to the two-issue rule is appropriate. Given that appellees failed to request interrogatories that might have explained the verdicts, we must presume that the awards were based on both claims; and since one of these claims was tried free from error, error in presenting the other will be disregarded. Thus, a new trial is not required.

**{¶ 68}** Finally, appellees contend that some of the issues they raised in the court of appeals are as yet unresolved, and that we should remand the cause to that court for further consideration. We disagree, finding a remand on those issues to be wholly unnecessary.

{¶ 69} Since we have held that the court of appeals correctly decided in favor of appellees on the sexual harassment claim, there is no need to remand for further consideration as to the sufficiency of evidence to support that claim. The grounds alleged by appellees in support of their new-trial assignment of error in the court of appeals, except for one, do not raise any issues that the court of appeals has not already addressed in conjunction with appellees' other assignments of error. The one issue that was not considered by the court of appeals was appellees' contention that "[t]he trial judge's partisan questioning of witnesses inflamed the passion and prejudices of the jury." However, we have reviewed the entire record and find this contention to be unsupported. This case was truly and well tried, without the intervention of any prejudicial error on the part of the trial court.

{¶ 70} Accordingly, the judgment of the court of appeals is reversed as to this issue, and the trial court's judgment as entered on the jury's verdicts is reinstated.

*Judgment reversed.*

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in part and dissent in part.

COOK, J., dissents.

———————————

**MOYER, C.J., concurring in part and dissenting in part.**

{¶ 71} I concur in the syllabus law announced in the majority opinion. However, I respectfully dissent from the decision of the majority because it changes the law relating to the two-issue rule that has been consistently applied by this court and other courts in Ohio.

{¶ 72} The majority agrees that the trial court should not have given an instruction on sexual harassment. It nevertheless affirms the full amount of the jury's

verdict, including punitive damages in the amount of $1,280,000, based on its "determination that the jury, if not instructed on sexual harassment, would still have decided in appellant's favor on his claim for intentional infliction of emotional distress."

{¶ 73} But in failing to remand the cause for a new trial, at least as to the issue of damages, the majority implicitly accepts the premise that the jury determined the amount of its damages award based solely on a finding that plaintiff had established his claim of intentional infliction of emotional distress and included no damages in its award based on its finding of liability for sexual harassment.

{¶ 74} This conclusion is particularly confusing in view of the majority's statement that "[g]iven that appellees [defendants] failed to request interrogatories that might have explained the verdicts, we must presume that the awards were based on both claims." Consistency would require us to presume that in the absence of such interrogatories, the total amount of damages awarded by the jury, particularly punitive damages, was similarly based on findings of liability for both sexual harassment and intentional infliction of emotional distress.

{¶ 75} The majority's conclusion that we should, in effect, assume that the jury awarded damages based upon plaintiff's separate claim for damages arising from alleged intentional infliction of emotional distress is contradicted by the record. The trial was overwhelmingly focused on Hampel's claim of sexual harassment. Prejudice resulting from the giving of an unwarranted instruction on that claim is patent. Throughout the trial Hampel argued the sexual overtones of the case. In closing argument Hampel's counsel stated, "This is a case about sexual harassment. * * * It was sexual. It was about sex. It was based on sex."

{¶ 76} In summation to the jury, Hampel's counsel effectively merged the two claims of sexual harassment and intentional infliction of emotional distress ("We also know that many victims of sexual harassment suffer serious emotional distress," and "most people who would be harassed to this degree would be distressed"). Similarly,

twenty-three pages of the jury charge are devoted to the statutory claims for sexual harassment and employer retaliation, while only three go to the claim for intentional infliction of emotional distress. Further, the interrogatories, as quoted in the footnote to the majority opinion, focus on the elements of a claim of sexual harassment more than on the elements of intentional infliction of emotional distress.

**{¶ 77}** The court of appeals is correct in observing that "the jury returned a combined verdict, awarding compensatory damages on both the sexual harassment and intentional infliction of emotional distress claims. The punitive damages verdict did not explain whether the punitive damages award was based on the sexual harassment claim, the emotional distress claim, or both. Accordingly, the court cannot tell how much the jury would have awarded appellee solely for intentional infliction of emotional distress."

**{¶ 78}** As the court of appeals observed, this court has acknowledged that the two-issue rule " 'has not met with universal favor,' " and that we have indicated a reluctance to " 'further extend the operation of the rule.' " *Pulley v. Malek* (1986), 25 Ohio St.3d 95, 97, 25 OBR 145, 147, 495 N.E.2d 402, 404, quoting *H.E. Culbertson Co. v. Warden* (1931), 123 Ohio St. 297, 303, 175 N.E. 205, 207. Ohio precedent has established that the two-issue rule is grounded in the proposition that an appellant must demonstrate more than harmless error and show prejudice in order to justify reversal of a verdict. See *Pulley, supra; Wagner v. Roche Laboratories* (1999), 85 Ohio St.3d 457, 460, 709 N.E.2d 162, 164 (the two-issue rule "is in essence a rule concerned with prejudice"). Accordingly, the two-issue rule does not apply where the trial court instructs on a defense on which it should not have given an instruction. *Kehrer v. McKittrick* (1964), 176 Ohio St. 192, 196, 27 O.O.2d 82, 84, 198 N.E.2d 669, 672; *Ricks v. Jackson* (1959), 169 Ohio St. 254, 8 O.O.2d 255, 159 N.E.2d 225, paragraph four of the syllabus.

**{¶ 79}** Again, the court of appeals correctly stated the law that should be followed by this court when it stated on reconsideration that the "rationale applied by

the court in *Kehrer* and *Ricks* applies with equal force where the jury returns a general verdict on two or more claims, one of which should not have been submitted to it. Because the jury verdict could well have been based, in whole or in part, on the claim which was erroneously submitted, the entire verdict is affected by the error, and the two issue rule does not apply. * * *

{¶ 80} "This case is even clearer. The verdict forms disclose that the jury found for plaintiff on *both* claims. *Because one claim was submitted to the jury in error, and the damages awarded on each claim cannot be differentiated*, a new trial on the other claim should be ordered." (Emphasis added in part.)

{¶ 81} The court of appeals followed well-established law announced by this court and followed for many years by courts of appeals and trial courts. Neither party has cited a reason to change the established law. I would affirm the judgment of the court of appeals and remand the cause for a new trial on both liability and damages as to the claimed tort of intentional infliction of emotional distress. However, even assuming, as does the majority, that the two-issue rule applies in this case, the rule should be deemed applicable to preserve the jury's finding only as to the defendants' liability for the tort of intentional infliction of emotional distress. The two-issue rule should not be used to affirm both liability and damages.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

_____

**COOK, J., dissenting.**

{¶ 82} I respectfully dissent, because the majority misapplies the two-issue rule. Assuming "that the sexual harassment claim should not have been submitted to the jury," the fact that it *was* submitted along with the claim of intentional infliction of emotional distress requires us to assume that the jury based its award on both claims. It is for that very reason that we may not assume, as the majority

does, that the jury would have made the same award without the claim for sexual harassment.

{¶ 83} In my dissent in Wagner v. Roche Laboratories (1999), 85 Ohio St.3d 457, 463, 709 N.E.2d 162, 167 (Cook, J., dissenting), I wrote:

"Under *Ricks* [*v. Jackson* (1959), 169 Ohio St. 254, 8 O.O.2d 255, 159 N.E.2d 225], the two-issue rule 'does not apply where there is a charge on an issue upon which there should have been no charge.' *Id.* at paragraph four of the syllabus. The majority attempts to distinguish this case from *Ricks*, however, by concluding that greater prejudice resulted from the improper charge in that case. The quantum of prejudice, however, is not the barometer for application of the *Ricks* analysis." When an instruction is given with no evidence to support it, prejudice is generally presumed. *Id*. at 461, 709 N.E.2d at 165.

{¶ 84} The jury here awarded undifferentiated damages to Hampel on both the sexual harassment and the intentional-infliction-of-emotional-distress claims. Under Ricks, we may not use the two-issue rule to *presume* a lack of prejudice. Because I believe that the court of appeals correctly remanded this action for a new trial, I respectfully dissent.

————————————