OPINION
Plaintiff-Appellant Misti Gibson filed suit against Defendant-Appellee Federal Express Corporation and Dan Ashcraft, alleging sexual harassment. Thereafter, both defendants filed motions for summary judgment. The trial court overruled Ashcraft's motion, but sustained Federal Express's motion. The trial court found "no just cause for delay" in entering a final judgment in regards to Federal Express pursuant to Civ.R. 54(b) and Gibson then timely appealed.
Misti Gibson began working at Federal Express in July of 1997 as a handler. At that time, Dan Ashcraft was Gibson's supervisor. When she was hired, she was given an employee handbook which contained a summary of all Federal Express's policies, including its policy on sexual harassment. A full explanation of these policies could be found in the People Manual, which was available at the Federal Express location where Gibson worked. Gibson admitted that she had read both the employee handbook and the People Manual and referenced them several times.
Gibson alleged that beginning in the fall of 1997, Ashcraft began making unacceptable comments to her regarding her breasts. These comments included recommending a sports bra when she drove the tug equipment, telling her she could get two black eyes, and advising her she would not have back pain if she were not so top heavy. In addition, he mentioned that he had a weakness for breasts, and that he would like to take her to a New Year's Eve party because she would look better in a red dress than his wife. As time went on, Gibson characterized the comments about her as "more gross" and spoken to other employees instead of just to her. Gibson described one specific incident involving a pool party where Ashcraft told Gibson he would go if she would wear a two-piece bathing suit. After the party, Gibson alleged that Ashcraft made a comment to another co-worker, Eric Reese, that "he never had pounded, quote, his wife so hard because he was thinking of me."
Around the spring of 1998, Gibson mentioned to Ashcraft that she may be interested in participating in a system called JCATS, which allowed employees to apply for different positions within the company through the computer. The employee could access the computer to find out what positions were available, apply for one, and that division would send paperwork. To confirm, the employee and her manager would sign the paperwork and return it. The conversation between Ashcraft and Gibson occurred in passing in the hallway where Ashcraft advised her that he would not sign this paperwork if she applied because he needed her to remain there. When Ashcraft made this comment, Gibson thought because other employees had left, he needed the extra help until he could hire more people. Even after she began to doubt his motives, she decided not to apply for the new position of courier because she felt she would be more useful where she was at that time. In fact, up to the time of her deposition, she still had not applied for a different position at Federal Express. Further, Gibson stated in her deposition that she did not claim she was denied the opportunity for advancement or transfer as a result of sexual harassment.
Comments such as those mentioned above continued until the summer of 1998. At that time, Gibson began approaching other supervisors and co-workers when she needed approval or assistance to avoid contact with Ashcraft. However, she did not mention anything about Ashcraft's behavior or comments to any management personnel at Federal Express. When she discussed the issue with co-workers, they urged her to report Ashcraft, and assured her that her job would not be in jeopardy. In fact, at least one co-worker offered to report him for her.
Also in the summer of 1998, Gibson claimed she had considered reporting the harassment until a discussion occurred between she, Ashcraft and another co-worker. The co-worker had relayed a story about an individual at another company who filed a sexual harassment suit. In response, Ashcraft stated that the woman "probably wouldn't get no money anyway, and then the company would fire her."
In October of 1998, Gibson entered the office of Steve Maggio, another manager at Federal Express. She intended to show him a bill to avoid going to Ashcraft, who, as her supervisor, would normally handle such things. Gibson had no intention of reporting Ashcraft's behavior to Maggio at that time. However, when she approached him with the bill, he commented that he was tired of Ashcraft's employees coming to him for everything and asked Gibson why she did not take this to Ashcraft. Gibson responded that she was not comfortable going into Ashcraft's office. When questioned why, she explained that he referred to her as a body instead of a human being and did not respect her as a woman. At some point in this conversation, Maggio opened the People Manual and showed Gibson that there was a policy against sexual harassment. He then called in another manager, Nancy Phillips, and requested that Gibson write out a statement documenting her allegations against Ashcraft.
Gibson acknowledged that Maggio and Phillips took her complaint very seriously. After completing her statement, the managers advised Gibson they would report the information to their manager, Niles Cline. Before leaving Maggio's office, both Maggio and Phillips apologized for her trying experiences and explained they were not aware that it was happening. They offered to allow her some time off, offered counseling and advised her to call them at home any time, day or night. For some time, they contacted her on a daily basis to check on her welfare. Following October 23, 1998, Gibson experienced no further treatment that she would classify as sexual harassment.
Shortly thereafter, Niles Cline and Rebecca Bell, the personnel representative, also met with Gibson, and she wrote out another statement. Both Cline and Bell also offered Gibson time off, counseling and the ability to contact them at any time. At this meeting, Cline and Bell asked Gibson what outcome she desired. Gibson chose the option of having Ashcraft terminated, which ultimately occurred. When asked at deposition if she was satisfied with the decision that was made regarding Ashcraft, she replied that she was.
In addition, Gibson admitted that Ashcraft's behavior did not prevent her from performing her job. Her performance evaluations were satisfactory and she received regular increases in pay. She was never demoted, and she admitted that she was not prevented from obtaining a promotion or a transfer because of the harassment.
In her appeal, Gibson essentially argues that the trial court erred in granting summary judgment for Federal Express. Instead of setting forth assignments of error, she lists several issues for review, which all can be addressed together to determine whether the trial court's decision was in error.
An appellate court's review of a summary judgment decision is de novo.Nilavar v. Osborn (1998), 127 Ohio App.3d 1, 10, citing Grafton v. OhioEdison Co. (1996), 77 Ohio St.3d 102, 105. In reviewing a summary judgment decision, the appellate court must apply the standard found in Civ.R. 56, the same as a trial court. According to Civ.R. 56, a trial court should grant summary judgment only when the following tripartite test has been satisfied: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64, 66.
The moving party has the burden to establish that there is no genuine issue as to any material fact. Id. This burden can only be met by identifying specific facts in the record which indicate the absence of genuine issues of material fact. Dresher v. Burt (1996), 75 Ohio St.3d 280,293. By establishing that the non-moving party's case lacks the necessary evidence to support its claims, the moving party has successfully discharged its burden. Id. at 289-90.
Once this burden has been met, the non-moving party then has a reciprocal burden as outlined in Civ.R. 56(E), which provides the "adverse party may not rest upon the mere allegations or denials of [the party's] pleadings," but "must set forth specific facts showing that there is a genuine issue for trial." See id. at 293. Civ.R. 56(E) provides if the non-moving party does not respond or outline specific facts to demonstrate a genuine issue of material fact, then summary judgment is proper. Id.
Initially, we recognize that the Ohio Supreme Court has consistently held that federal case law addressing Title VII is generally applicable to cases involving R.C. Chapter 4112. See e.g. Hampel v. Food IngredientsSpecialties, Inc. (2000), 89 Ohio St.3d 169, 175 (citations omitted). InHampel, the Supreme Court examined Title VII case law and determined that a plaintiff can prove sexual harassment in violation of R.C. 4112.02(A) by proving either of two types, quid pro quo or hostile work environment. Id. at 176. The distinction between these types of harassment are relevant to determine whether the conduct involved falls within the purview of Title VII or R.C. 4112.02. However, because our only concern here is Federal Express's liability, we need not address whether the incidents described by Gibson amounted to actionable harassment, and we make no such findings. Instead, we must focus our attention on whether Federal Express is vicariously liable for the actions of its supervisor. In doing so, we recognize that agency principles control and not the distinctions of quid pro quo and hostile work environment harassment. Ellerth, 118 S.Ct. at 2265. For purposes of this appeal, we will assume that Gibson could prove some type of harassment contemplated under R.C. 4112.02.
In Ellerth, the Supreme Court established the general rule that when a supervisor sexually harasses an employee, it is not conduct within the scope of employment. Ellerth, 118 S.Ct. at 2267. However, agency principles may impose liability on an employer even when the supervisor's conduct is outside the scope of employment. These principles are set forth in the Restatement (Second) of Agency § 219(2):
 (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
(a) the master intended the conduct or consequences, or
(b) the master was negligent or reckless, or
 (c) the conduct violated a non-delegable duty of the master, or
 (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.
Id. There is no allegation that Federal Express either intended this conduct or was negligent or reckless in allowing it to occur. Further, a non-delegable duty was not involved. Therefore, the only potential grounds for imposing liability on Federal Express are in subsection (d). This section imposes liability on the company if the supervisor had apparent authority or if the supervisor was aided in committing sexual harassment based on the agency relationship. Without going into great detail about the theory of apparent authority, it will suffice to say that it only applies where "the agent purports to exercise a power which he or she does not have." Ellerth, 118 S.Ct. at 2267. As a supervisor, Ashcraft had actual power, so the doctrine of apparent authority would not be applicable.
Instead, we turn to the aided in the agency relation standard. In order to impose liability on an employer for a supervisor's actions under this standard, not only must a plaintiff establish an employment relationship, but also the supervisor's activities must have resulted in a tangible employment action. Ellerth, 118 S.Ct. at 2268. If a tangible employment action is proven, then the inquiry ends and vicarious liability may be imposed. Peterson v. Buckeye Steel Casings (1999),133 Ohio App.3d 715, 723. On the other hand, if no tangible employment action was taken, the employer can raise an affirmative defense comprised of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 118 S.Ct. at 2270.
The Ellerth Court discussed at great length what is meant by a tangible employment action. First, the Court explained, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 2268. To illustrate, the Supreme Court cited the following cases in which a tangible employment action was not found:Flaherty v. Gas Research Institute (7th Cir. 1994), 31 F.3d 451, 456 (a "bruised ego" is not enough); Kocsis v. Multi-Care Management, Inc. (6th Cir. 1996), 97 F.3d 876, 887 (demotion without change in pay, benefits, duties, or prestige insufficient); Harleston v. McDonnell Douglas Corp.
(8th Cir. 1994), 37 F.3d 379, 382 (reassignment to more inconvenient job insufficient). Id. at 2269.
In addition, some federal appellate cases decided since Ellerth further explain the term "tangible employment action." See Morris v. OldhamCounty Fiscal Court (6th Cir. 2000), 201 F.3d 784, 789 (receiving a "very good" evaluation rating instead of "excellent" was not a tangible employment action); Jackson v. City of Columbus (6th Cir. 1999),194 F.3d 737, 744-45 (reassignment to residence and subsequent suspension, all with pay, not sufficient).
Gibson alleges in the present case that Ashcraft's harassment prevented her from transferring to a higher-paying position. However, the record clearly indicates that this allegation is based upon a brief hallway conversation in which she expressed a possible interest in becoming a courier. Ashcraft told her that he would not sign for the transfer because he needed her there, which Gibson believed at that time. Regardless, Gibson admitted that she never attempted to apply for this position at any time, even after Ashcraft was terminated. When examining these facts in light of the above case law, we find as a matter of law that this brief hallway conversation does not amount to a tangible employment action. Consequently, we agree with the trial court in finding no tangible employment action was taken in this case.
With that established, we now must determine whether Federal Express has established the elements of its affirmative defense. While a written company policy on sexual harassment is not a mandatory requirement, the existence of such a policy is appropriately discussed under the first element of the company's affirmative defense. Ellerth,118 S.Ct. at 2270. Gibson explained that she was given an employee handbook when she was hired which summarized Federal Express's policy on sexual harassment, including reporting instructions. She was fully aware that a more detailed explanation of the policy could be found in the People Manual, a copy of which was available at work. Further, Gibson admitted that she had read both the employee handbook and the People Manual before, and had referenced them on several occasions. This is sufficient to establish that Federal Express exercised reasonable care to prevent sexual harassment. In addition, once a management employee was alerted to Gibson's alleged harassment, the complaint was processed expeditiously, ultimately resulting in Ashcraft's termination. Gibson even conceded that this was an acceptable outcome to her complaint.
As to the second step, although Gibson admitted she was aware of a sexual harassment policy, she did not take any steps to either prevent or report the abuse. Moreover, the record indicates that several co-workers explained to her that a sexual harassment policy existed and that her job would not be in jeopardy if she reported the harassment. At least one co-worker even offered to report it for her. Still, Gibson did not mention the harassment to any management personnel until over a year after it allegedly began, and only then because she was directly asked why she was not approaching Ashcraft when she needed assistance. Ellerth
stated that a demonstration of the employee's failure to use the company's complaint procedure is sufficient to satisfy the employer's burden under the second step of the affirmative defense. Ellerth,118 S.Ct. at 2270.
Based on the foregoing discussion, we agree with the trial court that Federal Express satisfied its burden by establishing no genuine issues of material fact regarding absence of a tangible employment action and satisfaction of the elements for the affirmative defense. Because Gibson failed to present any evidence to demonstrate a genuine issue of material fact for trial, Federal Express was entitled to judgment as a matter of law. Accordingly, we find the trial court did not err in granting summary judgment in favor of Federal Express. Judgment affirmed.
YOUNG, J. and FAIN, J., concur.