OPINION
{¶ 1} Plaintiff-appellant, Julie Hinkle, appeals from the June 11, 2002 decision of the Ohio Court of Claims rendering judgment in favor of defendant-appellee, Ohio Department of Transportation ("ODOT"). Appellant's complaint alleged sexual discrimination under R.C. 4112.02(A). For the reasons that follow, we affirm the judgment of the Ohio Court of Claims.
 {¶ 2} On December 1, 2000, appellant, who is of Native American descent, filed a complaint against ODOT in the Ohio Court of Claims. The complaint alleged that appellant "was subjected to unwelcome sexual comments directed to her. Other workers at the worksite would comment on the size of her breasts and lips. Other workers would discuss dreams about her, falsely accuse her of having sex with them and make other demeaning and derogatory remarks of a sexual nature." (Complaint, ¶ 4.) According to appellant, this conduct constituted unlawful discriminatory practices in violation of R.C. 4112.02(A).
 {¶ 3} Appellant began working at ODOT in 1986 at the Geauga County garage. Appellant worked as a Highway Worker II, where her duties consisted of plowing snow in the winter and cutting trees in the summer. On August 29, 1999, after working 13 years at the Geauga County garage, appellant voluntarily transferred to Lake County.
 {¶ 4} On September 22, 1999, appellant completed an Equal Employment Opportunity ("EEO") statement alleging that she was sexually harassed while at the Geauga County garage. On December 1, 2000, appellant filed a complaint in the Court of Claims and, on December 29, 2000, ODOT filed an answer. By entry dated March 5, 2001, the trial court set the matter for trial to commence on December 17, 2001, at which time the case was bifurcated and the trial court only considered the sole issue of liability.[1]
 {¶ 5} At trial, appellant testified that Tom Filla, Jeff Palmer, and Ron Wiech sexually harassed her. Specifically, appellant testified that Filla called her "a whore" and commented that she slept with whomever she got along with. (Tr. 79.) Appellant testified that the most offensive conduct exhibited by Filla was when he told her, in front of other co-workers, that he had sexual dreams about her. (Tr. 80, 108.)
 {¶ 6} Appellant testified that she and Wiech had heated arguments and he called her "a whore * * * a pig * * * squaw * * *." (Tr. 86.) Appellant testified that the most offensive comment Wiech ever said to her was when he called her a "cunt bitch" in front of other co-workers in the lunchroom. (Tr. 109.)
 {¶ 7} Appellant testified that Palmer's conduct was not as offensive as Wiech's. Appellant stated that Palmer would make comments about women in general and that women were not supposed to be working at the garage. Appellant testified that Wiech and Filla were the biggest instigators, and that they would get Palmer to join in. (Tr. 109-110.)
 {¶ 8} Appellant also testified that there were rumors about her being involved in a gangbang in the back of one of the ODOT dump trucks. Appellant further testified that she cried all the time at the workplace and at home. (Tr. 97.) Appellant alleged she complained to managers Dennis Cratcherville and Vince Armenti, and Superintendent Michael Paoletto, all upper level management, about the alleged harassment. Even with her complaints, the alleged conduct of the three men continued. (Tr. 82, 112.) Appellant stated that she tried to avoid the men by volunteering to work in the body shop or on the tree crew. Appellant further testified that the conduct of the men worsened after the sexual harassment seminars. (Tr. 116.) Appellant stated that after she transferred from Geauga County to Lake County, she continued to experience harassment because the men at the Lake County garage were told by those at Geauga County not to trust her, and that she was a troublemaker. (Tr. 97.)
 {¶ 9} After two weeks at Lake County, appellant filed a complaint with the EEO. Appellant spoke to Lori Goddard, EEO Regional Program Administrator of ODOT's central office. According to appellant, she told Goddard about the alleged harassment she experienced at the Geauga County garage and who was responsible for the harassment. During the time of the investigation, appellant took a leave of absence and later filed for disability for post-traumatic stress disorder.
 {¶ 10} Several witnesses for appellant testified as to their observations of interactions between appellant, Filla, Wiech, and Palmer. Joseph Regina, a retired foreman and supervisor of ODOT, testified that he heard Filla call appellant a "bitch" and that she needed to stay at home, and care for her children instead of working. (Tr. 18.) Regina further testified that he heard both Wiech and Palmer refer to appellant as a "bitch." (Tr. 19.) Regina stated that he reported the incidents to his supervisor, Butch Hubner, but no program was implemented to prevent the type of conduct appellant was experiencing. (Tr. 22.) Regina testified that Wiech used the "F" word towards both men and women, but mostly towards the women. (Tr. 25.) Regina further stated that appellant did tell dirty jokes in the workplace. (Tr. 26.)
 {¶ 11} Crosby Ameen, a former Highway Worker II, worked for ODOT from 1987 to 2001. Ameen testified that he heard Filla call appellant a "bitch, whore, slut, squaw." (Tr. 29.) Ameen often heard appellant being called "Pocahontas" and a "nigger lover." (Tr. 42, 45.) Ameen testified that appellant complained to him, as well as to Manager Paoletto, and to anyone else who was around. (Tr. 30.) Ameen stated that Paoletto said that he would verbally discipline Filla and Wiech for the conduct. However, Ameen noted that even after the verbal discipline, Filla's conduct continued. Ameen testified that Wiech told appellant, while in Ameen's presence, that she was "a mother-fucking monster." (Tr. 33.) Ameen personally complained to Paoletto about Wiech's comments and Paoletto told Ameen that he would verbally discipline Wiech. Ameen did not see any written reprimands. Ameen testified that Palmer attacked appellant "behind her back" and called her a "bitch" or a "squaw" as she walked away. (Tr. 35.) Ameen testified that Filla and other co-workers made threats to him if he testified and gave a statement to EEO Investigator Goddard. (Tr. 38.)
 {¶ 12} Timothy Bluxon worked for ODOT from 1985 to 1990. Bluxon testified that he heard Filla call appellant a "squaw bitch" and a "nigger lover." (Tr. 48.) Bluxon testified that he was present when appellant reported the incident to Cratcherville. Bluxon testified that although Cratcherville stated that Filla's conduct was unacceptable, nothing was done about it. Bluxon noted that he was also present when appellant reported the incidents to Armenti, who in turn talked to Filla, Wiech, and Palmer. However, Bluxon testified that the conduct of the men got worse after that. (Tr. 51.) Bluxon said that appellant would break down and cry often.
 {¶ 13} Goddard testified on behalf of ODOT. She testified that she conducted a sexual harassment training seminar for bargaining unit employees at the Geauga County garage in 1997. (Tr. 144.) Goddard testified that Filla, Wiech, and Palmer attended the seminar, but appellant was not present. Goddard first became aware of appellant's allegations when Bill Tallberg, Labor Relations Officer, contacted Goddard explaining to her that appellant wanted to talk to Goddard about a situation at the garage.
 {¶ 14} Goddard met with appellant a couple of days later in order to get details regarding the activities that occurred at the Geauga County garage. (Tr. 155.) Appellant provided Goddard with a written statement and named Wiech, Filla, and Palmer as the men who were harassing her. Goddard told appellant that she would conduct an investigation. As part of her investigation, Goddard met with and interviewed Ameen and Paoletto. Ameen did not confirm or deny appellant's allegations. According to Goddard, Ameen was afraid to corroborate anything. (Tr. 161.) Paoletto told Goddard that when the men used rude and crude language towards appellant, Paoletto would tell the men to keep their mouth shut.
 {¶ 15} Goddard was unable to meet with Filla, Wiech, and Palmer. She requested for Tony Urankar, Business and Human Resources Administrator, to interview the three men and prepare a report for her. Goddard prepared a list of five questions for Urankar to ask the men. Based on Urankar's interviews, Goddard concluded that "[t]here were contradictory statements from both parties and that the allegations are unfounded, and then I recommended strong supervisory oversight by the county manager * * * and a direct order to all the employees involved to cease and desist and not to discuss the issue any further." (Tr. 175.) Goddard stated that the three men denied making any of the alleged comments towards appellant.
 {¶ 16} William Tallberg, a Labor Relations Officer for ODOT, testified that he met appellant when he worked as a Highway Worker I. Tallberg testified that after he became a Labor Relations Officer he periodically had conversations with appellant where she stated that employees at the Geauga County garage were bothering her. Tallberg testified that when he would try and inquire further, appellant would respond "never mind, I can take care of my own problems, I'm okay." (Tr. 220.) It was not until appellant moved to Lake County that she disclosed to Tallberg the incidents that occurred in Geauga County. Tallberg told appellant to talk to someone in the Columbus EEO office. According to Tallberg, appellant did not want to be bothered with the EEO process because she was in Lake County and she was happier there. (Tr. 223, 227.)
 {¶ 17} Stanley O'Neal Gresham, a former Highway Management Administrator of ODOT, testified that he spoke with appellant on September 5, 1997 about general concerns she had about harassment. (Tr. 232.) Gresham took notes of the conversation he had with appellant. Referring to those notes at trial and recalling the conversation, Gresham stated that "[appellant] contacted me to indicate some concerns about what she termed as harassment in the workplace. I questioned her as to whether or not the harassment was of a sexual nature. She indicated to me that it was not. * * * [H]er concerns were very generic and broad-based and not very specific." (Tr. 234.) Gresham noted that appellant never complained of sexual harassment in any of the conversations that he had with her. (Tr. 241.) The only incident that appellant reported was that of a Playboy magazine in the break room. Gresham stated that he did not recall appellant mentioning the names Filla, Wiech, and Palmer to him. (Tr. 242.) Gresham stated that based on what appellant told him, the decision was made to not conduct any investigations until after the sexual harassment training seminar.
 {¶ 18} Woodard R. Green, Transportation Manager 2, testified that appellant would come into the office he shared with Paoletto, crying and very distraught. (Tr. 254.) Green tried to persuade appellant to write down her specific complaints and provide him with names, but appellant told Green that she would handle the situation herself. Green testified that appellant never specifically indicated that she was being sexually harassed and by whom. (Tr. 266.) Green testified that he never heard Filla, Wiech, or Palmer make any derogatory or sexual oriented remarks towards appellant or call her any names. (Tr. 256-257.)
 {¶ 19} Paoletto testified that he heard appellant engaging in "shoptalk" or using swear words. (Tr. 273, 282.) Paoletto testified that he could not recall observing anyone using derogatory language towards appellant. (Tr. 273.) When appellant would come into Paoletto's office crying and upset, Paoletto told appellant that he needed a written statement from her in order to proceed. Appellant never gave Paoletto a statement. When appellant again complained to Paoletto on August 18, 1997 about problems she was having with her fellow workers, Paoletto gave appellant the opportunity to make a written statement. Appellant said, "forget about it." (Tr. 278.) Paoletto provided appellant with an EEO instruction booklet on how to file allegations and charges. However, appellant did not follow through.
 {¶ 20} Joseph G. Soond, Transportation Administrator for ODOT, testified that appellant never gave specifics about the remarks that were made or who they were made by. (Tr. 342.) According to Soond, appellant never complained about sexual harassing conduct, she merely stated that, "these guys are acting up." (Tr. 346.) Snood testified that he told appellant, "I need names. I need something in writing. I need to take this to whoever needs to see it. We need to do something, but if you're not gonna say any names or write anything down, my hands are kind of tied at this point." (Tr. 345.) Snood stated that he needed specifics, at least names, in order to take the matter up with the EEO. (Tr. 346.)
 {¶ 21} Palmer testified that he thought he and appellant were friends. (Tr. 295.) Palmer testified that he lent appellant money before and delivered groceries to her home for her children when appellant was unable to do so. Id. Palmer testified that appellant engaged in shoptalk and used swear words, and once described her weekend with a man as, "she fucked all weekend and was sore." (Tr. 297.) Palmer testified that he never sexually harassed anyone in the workplace, and never called appellant a "whore," "pig," "tramp," "slut," "squaw," "bitch," or a "cunt" or told appellant that he had sexual dreams about her or made reference or comments about her lips or her breasts. (Tr. 300-301.)
 {¶ 22} Filla testified that he had a "pretty good" relationship with appellant, they never argued, and they got along great. (Tr. 307, 318.) Filla testified that he never expressed to appellant that women should not be holding down jobs at the garage. Filla testified that he has heard appellant engaged in shoptalk and make comments about her own breasts. (Tr. 309, 311.) Filla testified that he did tell appellant that he had a dream about her, but the dream was not of a sexual nature. (Tr. 310.) Filla stated that the only time he commented on appellant's lips was when they both would get cold sores on their lips at the same time. Filla testified that he never sexually harassed anyone in the workplace, and never called appellant a "whore," "pig," "tramp," "slut," "squaw," "bitch," or a "cunt." (Tr. 312.)
 {¶ 23} Wiech testified that he had a "pretty good relationship" with appellant. (Tr. 322.) Wiech stated that he would give appellant rides home and she would confide in him about personal issues. Wiech stated that he observed appellant engaging in "shoptalk." Wiech testified that he and appellant would get into arguments over work related issues. (Tr. 325, 326.) Wiech testified that he had not sexually harassed anyone in the workplace, never called appellant a "whore," "pig," "tramp," "slut," "squaw," "bitch," or a "cunt," never commented on appellant's physical attributes, and never told appellant she did not belong in the workplace. (Tr. 327, 328.)
 {¶ 24} On June 11, 2002, the trial court concluded that appellant failed to prove her claim of sexual harassment for a hostile work environment by a preponderance of the evidence and rendered judgment in favor of ODOT. It is from this decision that appellant appeals, assigning the following as error:
 {¶ 25} "1. The lower court erred as a matter of law when it found that the harassment suffered by the plaintiff was not severe enough to alter the terms and conditions of employment.
 {¶ 26} "2. The lower court erred when it held that the plaintiff failed to prove that management knew or should have known of the harassment and failed to take corrective action."
 {¶ 27} Appellant's first and second assignments of error are interrelated and, as such, will be discussed together. Appellant contends that the sexual harassment she suffered was severe and pervasive to alter the terms of her employment, and that ODOT should be held liable because the company failed to adequately train the EEO officers and enforce the EEO policy.
 {¶ 28} R.C. 4112.02(A) provides that it is an unlawful discriminatory practice for any employer:
 {¶ 29} "[B]ecause of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."
 {¶ 30} Appellant contends she was subject to a sexually hostile work environment. Under Ohio law, "[i]n order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the `terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment,' and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action." Hampel v. Food Ingredients Specialties, Inc. (2000),89 Ohio St.3d 169, at paragraph two of the syllabus.
 {¶ 31} This court in Peterson v. Buckeye Steel Casings (1999),133 Ohio App.3d 715, 723, previously discussed circumstances that must be taken into consideration in evaluating a sexual harassment claim:
 {¶ 32} "Conduct that is merely offensive is not actionable as hostile work environment harassment under Title VII. Harris v. Forklift Systems, Inc. (1993), 510 U.S. 17, 21, 114 S.Ct. 367, 370,126 L.Ed.2d 295, 301-302. Title VII is violated `[w]hen the workplace is permeated with "discriminatory intimidation, ridicule, and insult," * * * "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."' Id. at 21,114 S.Ct. at 370, 126 L.Ed.2d at 301. To be actionable under Title VII, conduct must be severe or pervasive enough to create both an objectively hostile or abusive work environment — one that a reasonable person would find hostile or abusive — and a subjectively hostile work environment — one that the victim perceived to be hostile or abusive. Whether an environment is hostile or abusive must be determined by looking at all the circumstances. While no single factor is required, circumstances to consider may include the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely an offensive utterance, whether the conduct unreasonably interferes with an employee's work performance, and whether psychological harm results."
 {¶ 33} In this instance, although the trial court determined that Filla, Wiech, and Palmer were not credible witnesses, and opined that the three men did sexually harass appellant, the trial court nonetheless determined that appellant was precluded from recovery because the harassment appellant suffered was not sufficiently severe to have altered the terms and conditions of her employment. Appellant, however, contends that the terms and conditions of her employment were affected because she endured years of sexual abuse, stopped asking for overtime, refused to accept rides home from co-workers for fear of being accused of engaging in sexual acts with that person, and became disabled with post-traumatic stress disorder.
 {¶ 34} "[H]arassing conduct that is simply abusive, with no sexual element, can support a claim for hostile-environment sexual harassment if it is directed at the plaintiff because of his or her sex. However, the harassment is not automatically discrimination because of sex merely because the words used have sexual content or connotations." Hampel, at 180. "[I]n order to determine whether the harassing conduct was `severe or pervasive' enough to affect the conditions of the plaintiff's employment, the trier of fact, or the reviewing court, must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment." Id. at 181. A woman who makes the decision to work in a male-dominated work force, does not relinquish her right to be free from sexual harassment. Williams v. General Motors Corp. (C.A.6, 1999), 187 F.3d 553, 564.
 {¶ 35} In viewing the work environment as a whole, we note that the Geauga County garage was a male-dominated work environment, filled with "shoptalk" consisting of profanity and off-color jokes. Appellant was employed at the garage for about 13 years. Appellant testified that the harassment began when she first started her employment at ODOT in 1986. Appellant did not file a formal EEO complaint until September 1999, after she transferred to Lake County garage, and even then it was Labor Relations Officer Tallberg who initiated the filing of that complaint.
 {¶ 36} Further testimony of appellant's co-workers revealed that appellant often engaged in "shoptalk" and told off-color jokes at work. Appellant herself, even admitted to engaging in "shoptalk" and that the use of foul language did not offend her. (Tr. 79.) One of appellant's co-workers testified to appellant commenting on the size of her breasts, and describing her sex life after a weekend away with a boyfriend. Appellant testified that she reported the incidents of alleged harassment to upper management. However, a review of the evidence reveals that, while appellant complained, her complaints were never specific as to the offensive conduct and who was involved. Even when asked to provide further detail, appellant told her supervisors to forget about it and that she would handle the situation herself. Appellant herself acted as though the harassment was not severe. When viewed in terms of severity, and considering the totality of the facts and the surrounding circumstances, the harassment allegedly suffered by appellant may have been severe and pervasive, but because appellant waited 13 years to report any specific instances of sexual harassment, it is insufficient to survive ODOT's motion for summary judgment.
 {¶ 37} Moreover, appellant contends that ODOT is liable for failing to adequately train the EEO officers on how to handle a sexual harassment complaint. Appellant contends that ODOT failed to act when she made complaints of sexual harassment to her supervisors. The trial court held that appellant failed to meet the fourth requirement of Hampel, which requires appellant to establish one of two things, (1) that her supervisor committed the harassment; or (2) that ODOT knew or should have known about the harassment and failed to take corrective action.
 {¶ 38} Appellant considered Filla, Wiech, and Palmer to be her supervisors. R.C. 4117.01(F) defines supervisor as:
 {¶ 39} "[A]ny individual who has authority * * * to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other public employees; to responsibly direct them; to adjust their grievances; or to effectively recommend such action, if the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment * * *."
 {¶ 40} In this instance, Filla, Wiech, and Palmer were not appellant's supervisors. (Tr. 61.) Neither individual had the authority to hire, fire, or discipline appellant or any other employee. Appellant even testified that the men could not affect her salary, promotions, and raises, could not discipline her, and did not sign her evaluations. Therefore, appellant failed to establish that it was a supervisor who committed the harassment.
 {¶ 41} Soond, Green, and Paoletto were upper level management who had supervisory authority. Appellant contends that upon hearing her complaints, Soond, Green, and Paoletto were required to follow up on her complaints by producing a written document. The record indicates that ODOT disseminated a company policy prohibiting sexual harassment to employees that required an employee to report acts of sexual harassment. ODOT's Sexual Harassment Policy does state that upon being informed by an aggrieved party of sexual harassment, the supervisor:
 {¶ 42} "[S]hall immediately document the incident and immediately notify the district Business Human Resource Administrator. * * *" (Plaintiff's exhibit No. 1, at G-7.)
 {¶ 43} However, appellant's supervisors could only document the incidents and notify the EEO office if they had knowledge of appellant's complaints of sexual harassment. From 1986 to September 1999, appellant never reported incidents of sexual harassment to her supervisors, never gave specific details or specific names, and told her supervisors that the harassment she was experiencing was not sexual, and she did not want to pursue an EEO complaint, but would handle the matter herself. As such, there is no evidence in the record that ODOT knew or should have known of conduct alleged to be sexual harassment prior to September 1999. Therefore, we must review whether ODOT failed to take immediate and appropriate action once they learned of the alleged conduct toward appellant.
 {¶ 44} Although appellant filed a formal EEO complaint in September 1999, it was Tallberg who initiated the contact with Goddard, and not appellant. Appellant expressed to Tallberg that she was happy at the Lake County garage, and that she wanted to drop the complaint. (Tr. 223.) We agree with the trial court that ODOT acted quickly once appellant brought the incident to the attention of her supervisor. Where an employer knows or has reason to know that one or more of his employees are sexually harassing another employee, that employer may not sit idly by and do nothing. Kerans v. Porter Paint Co. (1991), 61 Ohio St.3d 486,493. The appropriate responses in dealing with such a situation "may range in severity from a verbal warning, to a transfer, to a temporary suspension, to a firing, will depend on the facts of the particular case, including the frequency and severity of the employee's actions." Id.
 {¶ 45} A review of the record reveals that a couple of days after their initial contact, Goddard conducted an interview with appellant that lasted 45 minutes. During that interview, appellant expressed to Goddard that she liked being at the Lake County garage better because the men there treated her with respect. Appellant told Goddard that the incidents were in the past and she was happy to move on. (Tr. 176.) Goddard later interviewed Ameen and Paoletto, both of which were unable to corroborate appellant's story. Urankar interviewed Filla, Wiech, and Palmer, who all denied the allegations of sexual harassment.[2] Goddard determined that appellant's allegations were unfounded and closed the case. Based upon our review of the record, we conclude that ODOT took reasonable, prompt, and medial measures to address appellant's complaint.
 {¶ 46} Furthermore, appellant's action was tried before the trial judge. "[W]here the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court." Myers v. Garson (1993), 66 Ohio St.3d 610, 614, citing, Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80 (noting that the trial judge is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony"). This is the case where the credibility of the witnesses was the determinative factor and, as there exists competent, credible evidence to support the trial court's judgment, it must be affirmed. Accordingly, appellant's first and second assignments of error lack merit and are not well-taken.
 {¶ 47} For the aforementioned reasons, appellant's first and second assignments of error are overruled, and the judgment of the Ohio Court of Claims is affirmed.
Judgment affirmed.
BOWMAN and BRYANT, JJ., concur.
[1] On March 30, 2001, the trial court determined that a conference concerning the scheduling of a second trial regarding the issue of damages would be held at a later date, if required. (Entry, March 30, 2001.)
[2] Appellant argues that since the interviews with Filla, Wiech, and Palmer were not conducted until March 8, 2000, ODOT violated the written sexual harassment policy that required the investigation to be completed within 60 days. Urankar testified that he was concerned about the effect of removing three experienced men from the garage during the snow and ice season. (Tr. 202.) Therefore, Urankar waited for a break in the weather and conducted the interviews in March 2000.