OPINION
{¶ 1} Plaintiff-appellant, Helen Bell, appeals from the November 29, 2002, decision and entry of the Franklin County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Ohio Savings Bank, and against appellant on her claims for sexual harassment and negligent and intentional infliction of emotional distress.
 {¶ 2} This case began on June 14, 2001, when appellant filed a complaint in the Franklin County Court of Common Pleas against both her former coworker, Henry Berryman ("Berryman"), and against appellee, seeking damages for hostile work environment sexual harassment, and negligent and intentional infliction of emotional distress. She claims she was subjected to the foregoing as a result of Berryman's harassing behavior directed toward her while both were employed by appellee. Appellant obtained a default judgment against Berryman. Appellee filed a motion for summary judgment seeking dismissal of all of appellant's claims against it. Appellant filed a motion for partial summary judgment seeking judgment against appellee on her claim for sexual harassment.
 {¶ 3} The trial court denied appellant's motion, and granted appellee's motion as to all of appellant's claims. With respect to appellant's hostile work environment sexual harassment claim, the trial court found that Berryman's conduct was not sufficiently severe and pervasive to affect the terms, conditions or privileges of appellant's employment. The court further found that the evidence did not support the conclusion that appellee knew or should have known of the harassment and failed to take immediate and appropriate corrective action with respect thereto. The court also found that appellant unreasonably failed to avail herself of the procedures for reporting Berryman's conduct as outlined in appellee's employee handbook. The court entered summary judgment in appellee's favor with respect to appellant's negligent and intentional infliction of emotional distress claims as well.
 {¶ 4} Appellant timely appealed, and asserts the following assignment of error for our review:
The trial court erred in granting summary judgment to defendant/appellee ohio savings bank.[1]
 {¶ 5} We review the trial court's grant of summary judgment de novo. Coventry Twp. v. Ecker (1995), 101 Ohio App.3d 38,654 N.E.2d 1327. Summary judgment is proper only when the party moving for summary judgment demonstrates: (1) no genuine issue of material fact exists, (2) the moving parties are entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, when the evidence is construed in a light most favorable to the nonmoving party. Civ.R. 56(C); State ex rel. Grady v. State Emp.Relations Bd. (1997), 78 Ohio St.3d 181, 677 N.E.2d 343.
 {¶ 6} The moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on the essential element(s) of the nonmoving party's claims. Dresher v.Burt (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264.
The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.
Id. at 293.
 {¶ 7} We construe the facts gleaned from the record in a light most favorable to appellant, as is appropriate on review of a grant of summary judgment. The following facts are taken from the deposition transcripts, affidavits and documentary evidence found in the record.
 {¶ 8} On August 14, 2000, appellant began working at appellee's North branch location, located on Dublin-Granville Road in Columbus. She was hired as a full-time customer service representative ("CSR I"), a position commonly referred to as a teller.
 {¶ 9} When appellant began her employment with appellee, Berryman held the position of personal banking specialist ("PBS") at the North branch. According to branch manager Michael Lawrence ("Lawrence"), PBSs handle new accounts, while CSRs such as appellant handle "line traffic" and transactions. Though PBSs earns a higher rate of pay than CSRs, Lawrence testified at deposition that PBSs are not in a supervisory role vis-à-vis CSRs. Appellant testified that she considered PBSs to be persons she would report to because they had more seniority than CSRs, they had more authority, and they would assist in training and in answering any questions CSRs might have. Appellant also testified, however, that Berryman did not determine her rate of pay and did not formally evaluate her performance in any way.
 {¶ 10} Upon her hire, appellant's immediate supervisor was Kevin Steurer ("Steurer") who was replaced by Joan Willard ("Willard") four or five months after appellant started work at the North branch. Steurer's and Willard's position was referred to as customer service supervisor ("CSS"). The immediate superior of Steurer and then Willard was Cathy Tefft ("Tefft"), known as the customer service manager ("CSM"). Lawrence was the branch manager throughout appellant's tenure at the North branch.
 {¶ 11} According to appellant, Berryman first touched her in an inappropriate way shortly after she was hired. Appellant claims that, throughout her tenure with appellee, Berryman would tickle her an average of three times per week. Appellant claims she told Berryman to stop, and to keep his hands off of her; she further claims she told him that it was not okay for him to tickle her. She testified at her deposition that she made it clear that she was uncomfortable and that the tickling was unwelcome. Appellant stated that she told Berryman that she is extremely ticklish, and that she is so ticklish that, when tickled, she "would lose self-control and hit people hard" and that she would be "violent" and "hit people" like she used to hit and punch her sisters when they would tickle her when they were all young.
 {¶ 12} Appellant testified that "everybody" at the bank knew how ticklish she was because appellant would involuntarily squeal loudly when tickled, even to the point of irritating her coworkers. When one coworker, Kellie Louk ("Louk"), complained out loud that appellant's squealing was "so annoying," appellant says she told Louk, "I tell him to stop, and he just keeps doing it." Appellant also claims that, while tickling her in the area of her waist and sides, sometimes Berryman would raise his hands gradually until he was touching her breasts. She stated that Berryman's making contact with her breasts was definitely intentional, and that "it was more than obvious" that he had touched her breasts.
 {¶ 13} Appellant stated that on three or four occasions Berryman would slap her buttocks. She described one such incident as follows:
On one specific Saturday, I can't remember the date, but I was getting my cash drawer out of the vault, and Joan [Willard] was there, and [Berryman] * * * was walking behind me and like doing like, making slapping motions towards my butt. And I was telling him "You better not touch me. Don't touch me or I'm going to hit you as hard as I can." And Joan was right there and she heard, and she would stand there and watch and see what happened.
And then I had my cash drawer in my hand and he still was doing the same — he was following behind me, and I was trying to get ready for opening, and we were in the vault and he still was messing with me, and Joan was standing like right there looking at us in the vault and she was looking, she had some papers in her hand and she was just looking right at us to see what he was doing, and I told him to leave me alone, to get away from me, do not touch me. And he just kept following me.
And then so he finally — he hit me on my butt once I got out of the vault and was next to my workstation, and Joan was right there still. And that's when I punched him. And at that time Joan finally said "Okay, you guys are getting out of hand" And while she was watching the whole time while he was bothering me, and it was clearly obvious that I was not okay with him bothering me, I'm yelling at him, I'm angry, the expression on my face shows that I'm not okay, and my tone and the manner that I'm speaking to him —
* * *
— displays that I'm not okay, but she just stood there the whole time and wouldn't do anything until I punched him and then he raised his hand to hit me back.[2]
 {¶ 14} Appellant claims that, in addition to Willard, coworker Sandy Welch ("Welch") witnessed Berryman slap appellant's buttocks. Appellant also claims that Berryman raised his knee into her buttocks on two occasions while she was standing behind the teller line, and that coworkers Louk, Welch and Sondra Tucker ("Tucker"), along with Willard and Steurer, witnessed Berryman knee her in the buttocks. Appellant also claims that, on numerous occasions, Tefft, Louk and coworker Rhonda Dingess ("Dingess") witnessed Berryman tickle her and touch her breasts, and witnessed her protesting this conduct. She says the aforementioned individuals heard her tell Berryman "no" when he would touch her breasts and buttocks, and that it was "more than obvious" that she was offended and upset. She also says that Willard witnessed Berryman touching her breasts.
 {¶ 15} Appellant further claims that, on more than 10 occasions, Lawrence witnessed Berryman putting his hands on her in an inappropriate manner (including tickling and touching her breasts) and also witnessed appellant's involuntary laughter in response to the tickling. She says Lawrence also heard appellant telling Berryman to stop. Appellant testified that, though Lawrence's desk was not located near the teller line, he could frequently be found behind the teller line doing such things as using the fax machine, retrieving supplies, or just standing behind the line observing and evaluating the tellers. Appellant claims Lawrence knew that she did not like to be tickled because Lawrence himself tickled her on one occasion in the Fall of 2000, on the same day that Berryman first tickled her, but Lawrence never tickled her again because appellant immediately indicated to him that she did not like it. She said:
I was startled that he did it, and I was scared and I was upset that he did it, and I didn't know what to say when he did it. So I'm sure my facial expression said that I wasn't okay with it because that might be why he never did it — that was the only time he did it. * * * But I didn't say anything verbally. I shook my head, but that was it.
 {¶ 16} Appellant stated that Steurer also joined in tickling her at that time, but he, too, stopped, "as soon as I told him to stop." Only Berryman continued to tickle appellant despite what she states were her obvious protestations.
 {¶ 17} Further describing Berryman's alleged harassing behavior, appellant related that Berryman would frequently go behind the teller line to talk to her and, shortly after she was hired, he began to "violat[e] [her] personal space," by, inter alia, standing close to her, "putting his hand on" her and trying to hug her. Though the two originally talked about Christianity and prayer, "once he started violating my personal space I would have to — I found myself pushing him away or backing up or moving a chair to separate us to let him know, hey, you know, back off of me." Appellant said that she would remind Berryman that he had a steady girlfriend and would tell him that he needed "to respect her" and "`try to focus on her' so he wouldn't focus so much on me." She stated that Berryman would not offer a response to such reminders and would just look at appellant and sometimes say, "oh." According to appellant, Berryman "just would not take `no' for an answer."
 {¶ 18} Appellant testified that, nearly every day, Berryman would stand behind the teller line to take or make a phone call (even though he had a telephone at his desk), and would stare at appellant's buttocks and breasts "for long periods of time" and would "look [her] up and down." She said she could feel him looking at her, and would glance up every now and then and would see that Berryman was continuing to stare at her. She said she would try to ignore it, but eventually she would get so uncomfortable and angry that she would move a chair in such a way as to block Berryman's view. She testified that Willard, Welch, Louk, Lawrence, Tefft, Tucker, Steurer and another coworker named Chris Barnhart all witnessed this staring. When asked how she knew that all of these individuals had witnessed the staring, she said, "I could actually look up and see the people looking at me and looking at him seeing what was going on. So it was pretty obvious that other people were looking and saw." Appellant said she would make eye contact with Willard while Berryman was staring at her, such that "it was undeniable that she saw." Some of Berryman's telephone conversations, during which the staring occurred, would last 15 to 30 minutes. Appellant believes that many of these conversations were with Berryman's fiancée.
 {¶ 19} Appellant also described incidents in which, on at least 10 occasions, when she would arrive at work in the morning shortly before her shift began, Berryman would open the door for her, then grab her by the arm and pull her in the building, and would sometimes shake her. She said Berryman was "definitely" trying to scare her, "because he was very successful at that." She stated that no other employees witnessed these incidents. She also described an incident that occurred during the winter of 2000-2001, in which she arrived at work one day wearing pants underneath her dress so as to keep warm while walking to work. She removed the pants in the restroom, folded them, and was preparing to put them away in a locker at her workstation, when Berryman came up and snatched the pants out of her hands. He held them up and pretended as though he was going to sniff them; then he told appellant that he was going to try to sell the pants to a gentleman customer who frequented the drive-up teller window, and who had previously asked appellant out to lunch. Appellant said Willard might have witnessed this incident.
 {¶ 20} In January 2001, appellant was promoted to the position of CSR II and given a raise. Shortly thereafter, however, appellant began having problems balancing her cash drawer. On March 24, 2001, she received a third-level warning disciplinary action for what the bank termed "excessive outages." Specifically, she was determined to have had a $1,000 outage on January 6, 2001, a $100 outage on February 23, 2001, and 10 other outages between March 3, 2001 and March 23, 2001. Appellant was given a 60-day plan of corrective action which required that she complete a "trial balance" of her drawer twice per day, and that she "run a tape" with each transaction to ensure accuracy. The tape was to be reviewed by management twice per day.
 {¶ 21} Appellant testified at her deposition that, after receiving the warning and action plan, she, "just started hating coming to work more and more knowing what I had to deal with every day." She also testified that she complained about the fact that many of the outages upon which the disciplinary action was based were minor outages, several amounting to less than $1, and that she had previously been told not to try to account for any outage that was less than $5 because such would not be "counted against her." She complained that she should have been given the opportunity, at the time each outage was discovered, to correct the problem, but instead was "always rushed out the door." She stated that when an outage is discovered, it is best to try to resolve it right away while the teller's memory of the day's transactions is still fresh. Sometime prior to the expiration of the 60-day action plan period, appellant was informed that she was "off probation."
 {¶ 22} Appellant testified she first began having anxiety attacks at work in April 2001. She consulted a physician and began seeing a counselor. The anxiety attacks consisted of appellant having trouble breathing and experiencing a rapid heartbeat. She stated she had had one previous anxiety attack, which occurred while she was taking a final exam in college. She claimed she began to have trouble keeping food down while at work shortly after Berryman began harassing her. She said she finally stopped eating while at work. She testified that, upon consulting with her physician about her panic attacks, she was surprised to discover that she had lost roughly 20 pounds.
 {¶ 23} Appellant says Berryman finally stopped harassing her after April 26, 2001, when she says she embarrassed him into ceasing his treatment of her. On that date, appellant was processing a transaction for a customer who had previously obtained a home mortgage loan from appellee through Berryman. Appellant said the customer might also have been acquainted with Berryman through a social connection unrelated to Berryman's employment with the bank, though appellant was not sure about this. While appellant was processing the customer's transaction, Berryman went up to the customer and engaged him in conversation. During the conversation, Berryman said something to the customer about appellant being a "devil" and about asking appellant if her horns had grown in yet. Appellant replied by saying, "Well, I'm not the one who's touching all over people inappropriately." According to appellant, Berryman appeared angry and walked away.
 {¶ 24} Appellant testified that, after April 26, 2001, Berryman never again said anything inappropriate to her or touched her in an inappropriate way, though he would give her "mean" looks and "slam stuff around." In fact, appellant testified that April 26, 2001, may have been the last time she ever spoke with Berryman.
 {¶ 25} In early May 2001, appellant missed nine days of work and had her sister deliver a doctor's excuse for her absences. Finally, however, Tefft advised appellant that she needed to inform Lawrence or Beth Lambert ("Lambert"), appellee's Regional Human Resources Manager, of the reason for her absences. Appellant went to the bank on one of her excused sick days to meet with Lawrence. She told Lawrence that the reason she had been missing work was because she had become physically ill and had been experiencing anxiety attacks because Berryman had been sexually harassing her since October 2000. Specifically, she cited Berryman having touched, felt and/or smacked her on the buttocks on a regular basis. Her specific allegations regarding how and when the touching would occur were consistent with those appellant later detailed during her deposition. When Lawrence inquired why she had not told him about this conduct months earlier, she told him that Berryman had confided in her that he was looking for another job, and she thought he would leave soon and she would not have to deal with his behavior anymore. She told Lawrence that, "she wanted to try and hold out, but is realizing that [Berryman's departure] was not going to happen." She also told Lawrence that the behavior was so readily apparent that she was surprised that no one else seemed to notice and that they were "letting him get away with it."
 {¶ 26} In her affidavit, Lambert avers that, on the afternoon of May 8, 2001, she received a telephone call from Lawrence in which he told her that appellant had been missing work because Berryman had been sexually harassing her since October 2000. After consulting with Lorie Hart, the Employee Relations Manager, Lambert immediately began an investigation into appellant's complaint. She took a statement from Lawrence. Then, roughly three hours after first receiving word of appellant's complaint, she telephoned appellant at her home, and left a message asking her to contact Lambert at her earliest convenience. Lambert telephoned appellant again the following day, and asked appellant to prepare a written statement about her allegations. The two arranged to meet the following morning (May 10th) at the North branch. Later, appellant called Lambert back, and due to a conflict in appellant's schedule, requested that the meeting take place on May 11th, to which Lambert agreed.
 {¶ 27} The two met as planned, and Lambert took appellant's written statement. This statement, attached to Lambert's affidavit, contains allegations consistent with those appellant made to Lawrence and those she detailed during her deposition. Appellant related that the effects of Berryman's conduct included weight loss, inability to keep food down while at work, panic attacks when Berryman would come near her, and appellant's doctor prescribing Paxil and Xanax to treat her anxiety. When asked whether Berryman's harassment affected her ability to perform her job, she stated "absolutely," and when asked how, she stated:
I can't function. I'm scared all the time. I'm jumping all the time. I can't focus. I can't properly do my job. I keep wondering when he comes back behind the line, is he going to touch me. I'm just scared.
When asked whether anyone saw or heard any of Berryman's conduct, she replied that "everyone in the branch" had seen it.
 {¶ 28} Lambert's notes from her interview with Louk, also employed as a CSR, or teller, reveal the following. Louk witnessed Berryman go behind the teller line and tickle appellant on numerous occasions. Appellant would "sound like a mouse" when he would tickle her, and Louk never had an indication that appellant "thought that was a sexual encounter." Louk did not recall ever hearing appellant tell Berryman to stop, or otherwise indicate she did not like the conduct. However, appellant's verbal reactions were so loud when Berryman would tickle her, that "everyone heard," and Louk is "sure Joan [Willard] probably witnessed it." With respect to appellant's job performance and demeanor, Louk noticed, beginning in February 2001, that appellant became progressively withdrawn, lacking in initiative, and more prone to mistakes with balancing her drawer. Louk also noticed that appellant had lost weight and mentioned to appellant "about how skinny she was." Finally, Louk noted, "I think people could take Henry the wrong way. It's just him. Everyone can be interpreted the wrong way if you're looking for it."
 {¶ 29} During Lambert's interview with Welch, Welch recalled that when appellant is tickled, "[s]he does a scream thing." She related that Steurer, Dingess, Berryman, and Welch herself had all tickled appellant. She said Berryman had probably slapped her (Welch) on the buttocks, but she didn't take offense because, "[w]e're jokesters." Welch confirmed that Willard, Tefft and Lawrence had all witnessed Berryman tickling appellant. Welch answered in the negative when asked whether the tickling had affected appellant's ability to perform her job because Welch "thought it was a joke." When asked whether she was aware of any other employees having similar complaints about Berryman's behavior, she answered in the negative. Then, she added that appellant's allegations had "made me think about how we play."
 {¶ 30} Lambert also interviewed Tucker, who was employed as a CSR. Tucker stated she had seen Berryman tickle appellant behind the teller line "quite often" and "she tells him to stop and he thinks it's all fun and games. * * * Everyone has their personal space and he is very close to her when he talks to her." Tucker related that customers had observed Berryman tickling and poking appellant, which Tucker viewed as unprofessional. But, "to [Berryman], it seems like it's all fun and games." Tucker stated she had seen Berryman touch appellant's breasts, but did not know if this was accidental or not. Tucker stated that, though appellant would tell Berryman to stop, appellant was "very soft spoken so I don't know if it got through to Henry." Tucker answered in the affirmative when asked whether she thought Berryman's conduct affected appellant's ability to perform her job.
 {¶ 31} As part of her investigation, Lambert also took a written statement from, and personally interviewed Tefft. In her written statement, Tefft stated that, "on a couple of occasions" she had observed Berryman tickle appellant in the sides during "morning huddles" (meetings during which everyone scheduled to work that day met to review issues pertinent to the day's work). When this would happen, Tefft recalled, appellant would "make a squealing noise and smile." Even when Tefft did not visually witness such tickling because she was at her desk and not behind the teller line, she "would hear [appellant] making a squealing noise" and would "assume Henry was tickling her." Tefft stated she does not recall appellant ever being noticeably upset, but Tefft had "always assumed they were playing around, because they attended church together and seemed to have a personal relationship."
 {¶ 32} During her interview with Lambert, Tefft emphatically denied ever seeing appellant hit or yell at Berryman, or tell Berryman to stay away from her. She said that if she thought she had witnessed inappropriate behavior she would have said something. She also stated that she thought appellant and Berryman "were good friends who would be comfortable telling each other when they were uncomfortable." When asked to respond to the notion that Tefft had the ability to stop Berryman's harassment of appellant, Tefft said, "I feel guilty. I wish I could have been behind the line seeing these things. I didn't see any of it. I would have said something." Finally, when asked whether she had any other information that she wished to add, Tefft offered, "[i]t is my personal opinion that I think Henry was attracted to Helen because she was a church going girl."
 {¶ 33} During Lambert's interview with Willard, Willard related that she first remembers Berryman touching appellant in December 2000. The first time she recalls seeing appellant get mad at Berryman and yell at him for this conduct was sometime after January 2001. After Willard became appellant's supervisor (in March 2000) she noticed appellant becoming more and more depressed, and also saw appellant tell Berryman to stop tickling her. Her explanation for not taking action included, "I honestly thought that Henry was trying to get her to laugh and open up since she has been so quiet and depressed lately." Willard also offered that, since she's taken on supervisory duties, she has not been "looking at the big picture" and is "not focused because of all the stuff I have to do." She stated that her subordinates "can say something to my face and I have to tell them to repeat it." With respect to the buttocks-slapping incident described by appellant, Willard recalled:
I don't remember the incident where Henry was making slapping motions. I remember Helen yelling at Henry with a stern look on her face — I don't know if it was for that incident or another. It could have been two months ago or two weeks ago. I just don't know.
 {¶ 34} Willard said that she considers tickling to be a form of harassment if the person does not want to be tickled. She then offered that she "just thought * * * Helen [was] in a bad mood." When asked to respond to appellant's charge that Willard should have done something to stop Berryman, Willard said, "I didn't see what was happening. She was laughing at times. Recently, I did notice her getting very upset. What seemed like hours to her was seconds to me." She also pointed out that she viewed appellant and Berryman as friends because "they both read their bibles" and "it was [Willard's] impression they went to the same church." She said, "[i]f a friend touches a friend, I didn't see anything wrong."
 {¶ 35} When asked whether Berryman's conduct affected appellant's ability to perform her job, Willard answered, "[d]efinitely." She recalled being very frustrated with appellant because "everything just stopped. She couldn't balance every single night. She could not do her job — it was almost impossible to get her to balance. You knew something was wrong but she wouldn't say. Just getting her to smile at one of her customers was hard. She just seemed very depressed."
 {¶ 36} Willard related that, as appellant appeared more and more depressed, Willard tried "on many occasions to get [appellant] to open up to me. She would just say, `it makes me want to cry. It's very serious, Joan.'" Willard stated she wished appellant would have come to her about her problems with Berryman. When asked if there were any other issues Willard wished to discuss, she replied, "I would like to know if I saw this happening in the future what I was supposed to do."
 {¶ 37} During Lambert's interview of Lawrence, he acknowledged that if he sees inappropriate behavior, it is his responsibility to address it, whether or not the employee being subjected to such behavior comes to him for help. Specifically, with reference to appellant, Lawrence said that if he had known "how she felt and what was going on" he would have "called HR to find out what to do. That is exactly what I did do when she brought it to me." Lawrence denied ever having witnessed any of the incidents upon which appellant's allegations were based. He said, "[j]ust because I may have been visible to the area doesn't mean that I witnessed it." Later, though, he said that the only thing he "may have heard" was appellant's squealing. He stated, "I asked what it was and they would all say oh they're just tickling Helen. I took it as them just having fun. I didn't realize it was just Henry doing it or the frequency of the incidents." He then stated that he heard appellant squeal "three or four times." He denied ever seeing appellant hit or yell at Berryman.
 {¶ 38} In her affidavit, Lambert avers that, as a result of the investigation she conducted, Berryman's employment with appellee was terminated. Appellant continued to work as a CSR II at the North branch through the end of July 2001. She says, however, that she was not really able to perform her job even with Berryman gone because she was still uncomfortable knowing she was, "working with people that would not help me." She also stated that the anti-anxiety medication she was taking made her drowsy, which adversely affected her ability to focus and to interact with customers. Appellant voluntarily resigned her position to accept employment with Huntington National Bank in Columbus. Shortly before her departure from her position with appellee, she filed the instant lawsuit. During its pendency in the court below, the parties conducted numerous discovery depositions prior to filing their cross-motions for summary judgment.
 {¶ 39} In her deposition, Tefft stated that what she had previously described to Lambert as "tickling" was more appropriately characterized as "poking" in the side with two fingers. Tefft testified that the poking occurred more than once but was "very infrequent," and that she witnessed such touching during morning huddles. Any poking that occurred during a morning huddle would have been observable by anyone present at such a meeting. Tefft confirmed that Lawrence had in fact witnessed Berryman poking appellant in the sides. Tefft stated that, in response to Berryman's poking, appellant would have a half-smile on her face and would make "a little squealing noise." She stated she never observed appellant give Berryman a disapproving look and never heard appellant tell Berryman to stop.
 {¶ 40} Tefft further testified that she thought appellant and Berryman were friends because she would see them first thing in the morning at Berryman's desk, discussing topics like church and food. She recalled observing these discussions from the time appellant started work at the North branch until approximately June 2001. When asked about appellant's demeanor, Tefft testified that appellant was always fairly quiet and kept to herself, but seemed happy when she started, and became more distant toward the end of her tenure. Tefft described appellant as seeming to have "a lot on her mind" toward the end. She observed appellant short of breath and anxious on one occasion, whereupon Tefft drove appellant to her apartment so that appellant could retrieve her anxiety medication. When asked about what she may have heard in addition to the tickling/poking she actually witnessed, Tefft recalled hearing appellant squealing on several other occasions, and assumed Berryman was "continuing his antics," but could not observe any touching because Tefft was at her desk and not behind the teller line. She stated she never approached Willard or any other supervisor regarding what she had observed between appellant and Berryman.
 {¶ 41} At her deposition, Willard testified that she, too, perceived appellant and Berryman to be friends, because the two would regularly talk casually about church and the Bible. However, Willard also testified that she observed Berryman tickle appellant on more than one occasion, and she recalled hearing appellant laugh. On one such occasion, Willard heard appellant use a stern voice to tell Berryman to stop; however, Willard assumed appellant was simply in a bad mood that day. Willard stated that, because she viewed the two as friends, she did not view the tickling as inappropriate behavior.
 {¶ 42} Willard said that Berryman tickled appellant in the ribs, just above the waistline, but Willard did not feel that Berryman ever touched appellant's breasts, or that he attempted to do so. Willard stated she never observed Berryman pull appellant into the bank through a doorway, or knee or slap appellant on the buttocks. Willard stated she never observed appellant being short of breath or having any type of anxiety attack, never observed instances where appellant looked embarrassed, and saw no change in appellant's weight because, according to Willard, appellant had always been very thin. However, she does recall that appellant began to be "unfocussed and withdrawn" in March or April 2001, and that since February 2001, appellant seemed "ill" and "like she was depressed." Willard testified she asked appellant what was wrong, and appellant would only refer to something that was "sad" and "stressful" but would not say what, specifically, was bothering her. Willard recalls one time when, after Berryman came up behind her and poked appellant in the sides, she gave Berryman a stern look and yelled at him to stop, whereupon he continued to poke her and she told him to stop once again.
 {¶ 43} Willard stated she was aware that if she observed any sexual harassment of someone under her supervision, she was supposed to report the situation to someone in Human Resources. She testified that she still does not believe that Berryman's tickling was sexual harassment, as that term is used in appellee's sexual harassment policy, because, to her, harassment has a "sexual component" only if "the two people perceived each other in a sexual way."
 {¶ 44} At his deposition, Lawrence testified that Berryman never held a supervisor position at the North branch. Lawrence denied ever having observed any touching at all between appellant and Berryman. He claimed he was far enough away from the teller line that he would not usually hear what was going on there. He recalled two or three occasions when appellant would make loud squealing noises that were "sort of like laughter," and his reaction would be to stand up and look, and if people were "goofing around" he would tell them to get back to work.
 {¶ 45} He acknowledged that tickling is a form of harassment if the tickling is offensive to the individual being tickled. He also acknowledged that, when a man tickles a woman, the tickling can have a sexual component to it. He further acknowledged that sexual harassment must be interpreted from the perception of the victim; that is, whether the behavior is harassing or not is determined by how the recipient feels about it. But he answered in the negative when asked whether he had a responsibility to determine how appellant felt about being tickled by Berryman.
 {¶ 46} Lawrence admitted that appellee's policy prohibits employees from tickling another employee, touching another employee's buttocks, grabbing another employee and pulling her into the bank, and exhibiting any threatening or intimidating behavior toward coworkers. He also confirmed that Tefft and Willard would be responsible to stop and report any of the aforementioned behaviors, if they observed it. He also stated that any employee, whether a manager or not, who had witnessed Berryman touch appellant's buttocks and/or breasts, would be required to report such behavior to a supervisor. When asked whether, if Willard had witnessed appellant yelling at Berryman with a stern look on her face, she, as a manager, was obliged to find out what was going on, Lawrence answered in the affirmative.
 {¶ 47} At her deposition, Tucker testified that, though appellant would talk about church with Berryman from time to time, other than that, appellant did not appear to be friends with Berryman. Tucker further observed that appellant appeared somewhat uncomfortable with Berryman. Tucker witnessed Berryman tickle appellant "quite often," and also witnessed Berryman poke appellant's breast. She never witnessed Berryman touch appellant's buttocks. She said that when Berryman would tickle appellant, appellant would have an involuntary response of laughing and squealing, but would also tell Berryman to stop. She noted that appellant is "very timid and mild spoken" so appellant's way of telling Berryman to stop was "more soft" and "not at all the way that I would have told him to cut it out, stop, look, no." She said this difference had to do with differences in personalities, but that it was clear to Tucker that appellant was telling Berryman, to the best of her ability, to leave to her alone. She also noted, however, that if one did not already know that appellant was uncomfortable with Berryman, then one might just have perceived the situation as "all in fun and games, sort of." Tucker believes that Berryman's primary motivation for tickling appellant was to hear her laugh and squeal.
 {¶ 48} Both parties deposed Berryman after appellant obtained a default judgment against him. He testified that he and appellant were "work friends" and that the two would talk about church (though they did not attend the same one) and would also share problems and concerns. He stated they would talk either at his desk (but not during banking hours) or behind the teller line. Berryman's desk was situated at the end of and behind the teller line, and he would normally work at his desk, but would go behind the teller line if he was needed to assist with an "override."
 {¶ 49} Berryman admitted that he tickled and/or poked appellant in the sides of her waist, but could not recall how often. He admitted tickling appellant behind the teller line but denied having done so in any "morning huddles." He denied making slapping motions toward appellant's buttocks, and denied touching appellant's buttocks, except for one occasion when, he testified, he needed to get by her behind the teller line, and his hands were full, so he nudged her out of his way using his knee. Berryman admitted pulling appellant into the building, but denied ever grabbing her pants out of her hands and pretending to sniff them. He denied ever intending to touch appellant's breasts, or ever actually touching them.
 {¶ 50} Berryman admitted that appellant would tell him to stop when he would tickle her, but stated he did not think she was serious because she would do so while laughing, and because she had laughed while protesting on prior occasions when Steurer and Welch had tickled her. He said appellant never hit him in response to his tickling, but only tapped his hand He said that he would have stopped tickling her if she had ever told him that it caused her stress, but she never did. He said he did not notice that appellant had lost any weight, but noted that he would not necessarily notice any such weight loss because appellant was already very thin. He never personally observed her anxiety attacks, but had heard about them from "conversation going around the bank." He attributed appellant's anxiety attacks to other causes, but not to his tickling, and stated he was shocked when he learned from Lambert that appellant had complained about his behavior.
 {¶ 51} Berryman could not recall whether Lawrence ever witnessed Berryman tickling appellant, but stated unequivocally that Tefft, Willard and Steurer did witness it on more than one occasion. He stated that if any one of these individuals had told him to stop tickling appellant, he would have done so because he considered them to be his "superior officers." Berryman testified that the squealing noise that appellant made when she was being tickled was so loud that "everybody" would look, including Lawrence, Tefft, Willard and Steurer, and the noise would attract customers' attention as well. Berryman testified that he never tickled any teller other than appellant. Finally, he admitted that appellee's internal investigation resulted in a finding that he had in fact sexually harassed appellant, and he was later terminated.
 {¶ 52} Appellee promulgated a sexual harassment policy ("the policy") that was in effect throughout appellant's employment with appellee. The record reveals that, on her first day of employment, appellant acknowledged receipt of the Ohio Savings Financial Corporation Employee Handbook, within which the policy was contained. The policy prohibits, inter alia, any "verbal or physical conduct or visual image that has the purpose or effect of creating an intimidating, hostile or offensive environment." The policy defines "sexual harassment" to include any unwelcome physical conduct that "has the purpose or effect of unreasonably interfering with the individual's work performance or creating an intimidating, hostile, or offensive work environment." The policy also includes within the definition of "sexual harassment" the concepts of "flirtations" and "touching."
 {¶ 53} With respect to reporting, the policy provides that:
In order for the Bank to effectively enforce this policy and to take prompt, appropriate corrective measures, it is essential that any and all incidents of harassment be reported to the Employee Relations Director or Senior Vice President of the Human Resources Department. Employees in Human Resources may also report an incident to any Executive Vice President or the President of the Company.
* * *
No employee shall be subjected to adverse employment action in retaliation for any good faith report of harassment or participating in an investigation about harassment under this Policy.[3]
 {¶ 54} Having reviewed the facts of record, we now turn to the applicable statutory and decisional law governing appellant's sexual harassment claim against appellee. Chapter 4112.02(A) of the Ohio Revised Code prohibits an employer from engaging in sexual discrimination against an employee. Specifically, the subsection prohibits discrimination "because of * * * sex." Case law interpreting and applying Title VII of the Civil Rights Act of 1964, Section 701 et seq., as amended, Section 2000e et seq., Title 42, U.S. Code ("Title VII"), is generally applicable to cases involving R.C. Chapter 4112. Genaro v. Cent. Transport,Inc. (1999), 84 Ohio St.3d 293, 703 N.E.2d 782.
 {¶ 55} The Supreme Court of Ohio has established:
A plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination "because of * * * sex" by proving either of two types of sexual harassment: (1) "quid pro quo" harassment, i.e., harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2)" hostile environment" harassment, i.e., harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment.
Hampel v. Food Ingredients Specialties, Inc. (2000),89 Ohio St.3d 169, 729 N.E.2d 726, paragraph one of the syllabus. (Emphasis sic.)
 {¶ 56} Appellant contends that she was subjected to a hostile work environment. In order to establish a claim of hostile work environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the harassment was committed by a non-supervisor employee and the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. Id. at paragraph two of the syllabus.
 {¶ 57} The conduct at issue must be "unwelcome" in that the plaintiff neither solicited it nor invited it and regarded the conduct as undesirable or offensive. See Meritor Sav. Bank, FSBv. Vinson (1996), 477 U.S. 57, 68, 106 S.Ct. 2399,91 L.Ed.2d 49. "The proper inquiry is whether [appellant] indicated by [her] conduct that the alleged harassment was unwelcome." Quick v.Donaldson Co. (C.A. 8, 1996), 90 F.3d 1372, 1378, citingMeritor, supra, at 68. Appellee does not dispute that appellant has made out a prima facie case with respect to this first element of her hostile work environment claim.
 {¶ 58} Whether harassing conduct constitutes discrimination based on sex is determined by whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. Oncale v.Sundowner Offshore Serv., Inc. (1998), 523 U.S. 75,118 S.Ct. 998, 140 L.Ed.2d 201; Scusa v. Nestle U.S.A. Co. (C.A. 8, 1999),181 F.3d 958, 965. See, also, Harris v. Forklift Sys., Inc.
(1993), 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295
(Ginsburg, J., concurring). But, "[h]arassment alleged to be because of sex need not be explicitly sexual in nature."Hampel, supra, at 178-179, quoting Carter v. Chrysler Corp.
(C.A. 8, 1999), 173 F.3d 693, 701. Actions that are simply abusive, with no sexual element, can support a claim for sexual harassment if they are directed at an employee because of his or her sex. Id. at 178. Appellee also does not dispute that appellant has made out a prima facie case with respect to this second element of her sexual harassment claim.
 {¶ 59} Appellee does dispute, however, that appellant has put forth sufficient evidence to create a genuine issue of material fact with respect to the third and fourth prongs of her sexual harassment claim. The trial court agreed with appellee; thus, our resolution of appellant's assignment of error turns on our de novo review of the trial court's findings with respect to those two prongs, which we will discuss in turn.
 {¶ 60} The first issue is whether the claimed harassment was sufficiently severe or pervasive. Conduct that is merely offensive, without more, is not actionable as hostile work environment harassment under Title VII. Harris, supra, at 21. In Harris, the United States Supreme Court went on to explain:
Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.
Id. at 21-22. Thus, to be actionable under Title VII, conduct must be severe or pervasive enough to create both an objectively hostile or abusive work environment and a subjectively hostile work environment. Peterson v. Buckeye Steel Casings (1999),133 Ohio App.3d 715, 723, 729 N.E.2d 813. In assessing whether this third element has been satisfied, a court must determine whether the plaintiff was forced to spend her work day running "a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." Meritor Savings Bank v.Vinson (1987), 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49.
 {¶ 61} But the conduct complained of need not be psychologically injurious to constitute a hostile work environment. Hampel, supra, at 176. As the Supreme Court inHarris noted:
A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.
Harris, supra, at 22.
 {¶ 62} In assessing whether the conduct complained of is sufficiently severe or pervasive to constitute a hostile or abusive work environment, courts "must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment." Hampel, supra, at 181. The circumstances to be considered include, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 180, quoting Harris,
supra, at 23.
 {¶ 63} This "totality of the circumstances" standard, "precludes the kind of analysis that carves the work environment into distinct harassing incidents to be judged each on its own merits. Instead, it is essential that the work environment be viewed as a whole, `keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes.'" Id. at 181, quotingRobinson v. Jacksonville Shipyards, Inc. (M.D.Fla. 1991),760 F. Supp. 1486, at 1524. Therefore, "the `severe or pervasive' requirement does not present two mutually exclusive evidentiary choices, but reflects a unitary concept where deficiencies in the strength of one factor may be made up by the strength in the other." Ibid.
 {¶ 64} After a copious review of the evidence presented by both parties to this appeal, viewing the same in the light most favorable to appellant, and applying the factors advanced inHampel, supra, we find that there do exist genuine issues of fact with respect to whether Berryman's harassment of appellant was sufficiently severe and pervasive such that it resulted in an intimidating, hostile or offensive work environment. Appellant alleges that, on a regular basis over a period of roughly seven months, Berryman tickled and poked her, grabbed her, stared at her for significant periods of time, slapped or kneed her buttocks, and touched her breasts.
 {¶ 65} As in Peterson v. Buckeye Steel Casings (1999),133 Ohio App.3d 715, 724, 729 N.E.2d 813, the conduct complained of in this case "went well beyond offensive comments and included repeated and offensive touching." The conduct alleged was frequent and it usually occurred in a narrow workspace from which appellant could not remove herself while doing her job. Additionally, it was also physically invasive and, at times, threatening and intimidating. The conduct also affected appellant's work performance. Appellant clearly subjectively felt that her work environment was hostile and intimidating as a result of Berryman's actions. Given the numerosity and frequency of the physical invasions claimed, and the evidence that Berryman's conduct adversely affected appellant's ability to do her work, an issue of fact remains as to whether appellant's work environment was objectively hostile, intimidating and offensive.
 {¶ 66} Next, we review the trial court's determination that no genuine issue of fact exists with respect to whether appellee is vicariously liable for Berryman's allegedly harassing conduct. Employer liability for hostile work environment sexual harassment depends upon whether the alleged harasser is the plaintiff's supervisor or coworker. Peterson, supra, at 723. When the alleged harasser is a supervisor with immediate (or successively higher) authority over the employee, and when the harassment culminates in a tangible employment action against the plaintiff (such as discharge, demotion or undesirable reassignment), the employer is subject to vicarious (strict) liability and the analysis ends. Burlington Indus., Inc. v. Ellerth (1998),524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; Faragher v. Cityof Boca Raton (1998), 524 U.S. 775, 807-808, 118 S.Ct. 2275,141 L.Ed.2d 662.
 {¶ 67} Where no tangible employment action was taken as a result of the supervisor's harassing behavior, but an objectively and subjectively hostile work environment was created, the employer may avail itself of an affirmative defense to liability. To successfully raise this affirmative defense, an employer must establish, by a preponderance of the evidence, (1) that the employer exercised reasonable care to prevent and correct properly any sexually harassing behavior; and (2) that the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher, supra, at 807.
 {¶ 68} When, as in the present case, the alleged harasser is not a supervisor, but a coworker, neither vicarious (strict) liability nor the affirmative defense to vicarious liability applies. Harmon v. GZK, Inc. (Feb. 8, 2002), 2nd Dist. No. 18672. In the case of coworker sexual harassment, the employer may be liable to the plaintiff based on its own negligence. Id. Where an employer knows or has reason to know that one of its employees is sexually harassing other employees, the employer may not sit idly by and do nothing. Kerans v. Porter Paint Co.
(1991), 61 Ohio St.3d 486, 493, 575 N.E.2d 428. Under this scenario, an employer may be liable for the sexual harassment of an employee by a coworker when the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action. Peterson, supra, at 724, citingBlankenship v. Parke Care Centers, Inc. (C.A. 6, 1997),123 F.3d 868, 872-873, certiorari denied (1998), 522 U.S. 1110,118 S.Ct. 1039, 140 L.Ed.2d 105. An employer can be presumed to have knowledge of harassment if:
its supervisors had actual knowledge of the harassment * * * and" if these supervisors had a duty or reasonably could be believed to have such a duty, under the company's sexual harassment policy, to `pass on the information to someone within the company who has the power to do something about it.'"BreMiller v. Cleveland Psychiatric Inst. (N.D.Ohio 2000),195 F.R.D. 1, 29, quoting EEOC v. Mitsubishi Motor Mfg. of America,Inc. (C.D.Ill. 1998), 990 F. Supp. 1059, at 1072, quoting Youngv. Bayer Corp. (C.A. 7, 1997), 123 F.3d 672, 674.
 {¶ 69} But the "knew or should have known" standard in coworker cases means that an employer's actual knowledge of the harassment is not always necessary. BreMiller, supra, at 28. In other words, an employee need not necessarily report an incident of sexual harassment, and an employer will not necessarily escape liability if the employee does not. Ibid. "An employer may be charged with knowledge when an employee or employees complain to management, or when the sexual harassment is pervasive, whichgives rise to an inference of knowledge or constructiveknowledge." Ibid. (Emphasis added.)
 {¶ 70} Thus, in sexual harassment cases, an employer can obtain knowledge of harassment in two ways. See Gliatta v.Tectum, Inc. (S.D.Ohio 2002), 211 F. Supp.2d 992, 1002; see, also, Anderson v. Deluxe Homes of PA, Inc. (M.D.Pa. 2001),131 F. Supp.2d 637. The first method is actual notice, where the employee has reported the harassing conduct; the second method is constructive notice, where the plaintiff proves that the sexual harassment is so pervasive that the employer should have known of its existence. Ibid.
 {¶ 71} The appropriate response, once an employer acquires actual or constructive knowledge of the harassing conduct, will depend upon the facts of the particular case, including the frequency and severity of the employee's actions. Kerans,
supra, at 493. Once an employer has responded to coworker sexual harassment, it "can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." Blankenship, supra, at 873.
 {¶ 72} In the present case, appellant acknowledges that she did not report Berryman's alleged harassment to any person with the authority to remedy the situation until May 8, 2001. Additionally, she does not dispute that the actions appellee took on and immediately after that date, in response to her complaint, were reasonable and appropriate, and resulted in Berryman's termination, which foreclosed the possibility of any further harassment of appellant by him. Appellant argues, however, that the harassment she endured throughout the seven months immediately preceding her formal report was so pervasive that appellee was on constructive notice of the same far earlier than May 8, 2001, and negligently failed to take appropriate corrective action, thereby leaving appellant vulnerable to continued harassment.
 {¶ 73} While appellee's sexual harassment policy, which includes clear directives relating to reporting of such harassment, is relevant to the question whether appellee reasonably attempted to prevent harassment in the first instance, it does not absolve appellee from liability if it knew or should have known about harassing conduct, yet failed to do anything about it, as appellant alleges. The evidence adduced in the record demonstrates the existence of genuine issues of fact with respect to whether numerous individuals in supervisory and managerial positions witnessed Berryman's alleged harassment, and were aware it was unwelcome and that it intimidated appellant to the point of adversely affecting the conditions of her employment. When viewed in a light most favorable to appellant, the evidence supports the inference that supervisors knew that Berryman had created a hostile work environment for appellant far earlier than May 8, 2001, yet did not act reasonably to remedy the situation, including failing to adhere to the reporting requirements contained in appellee's own sexual harassment policy. Appellant has, accordingly, presented a genuine issue of fact as to whether appellee responded reasonably. Though appellant did not report the conduct at her earliest opportunity, because the negligence standard is "knew or should have known" the court does not find that appellant's failure to report the allegedly open and obvious conduct is fatal to her claim.
 {¶ 74} Because genuine issues of material fact exist with respect to the third and fourth elements of appellant's claim for hostile work environment sexual harassment, appellee is not entitled to summary judgment as to that claim.
 {¶ 75} Though appellant did not separately assign as error the trial court's denial of her motion for partial summary judgment, as is required by App.R. 16(A)(3), she argues in her brief that the trial court erred in so doing. Because appellant did not place this issue squarely before this court by assigning the supposed error separately, we decline to address the same. However, because we find the existence of genuine issues of fact as to the severity and pervasiveness of the alleged harassment, as well as whether appellee knew or should have known of the alleged hostile work environment earlier than May 2001, and failed to promptly take appropriate corrective measures, we would find, in any case, that appellant is not entitled to summary judgment on her sexual harassment claim.
 {¶ 76} For all of the foregoing reasons, we sustain appellant's sole assignment of error, reverse the judgment of the Franklin County Court of Common Pleas, and remand this cause to that court for further proceedings.
Judgment reversed; cause remanded.
Bryant and Petree, JJ., concur.
[1] In appellant's briefs she argues only that the trial court erred in granting summary judgment to appellee on appellant's sexual harassment claim, and wholly fails to address the trial court's grant of summary judgment as to her emotional distress claims. Accordingly, pursuant to App.R. 12(A)(2) and 16(A), we disregard her assignment of error insofar as it may encompass the emotional distress claims.
[2] Deposition of Helen Bell ("Bell Dep."), Vol. II, at 29-30.
[3] Prohibition of Harassment Policy, Ohio Savings Bank Employee Handbook (Rev. 1/2000), at 6.